Slip Op. 99-122

# UNITED STATES COURT OF INTERNATIONAL TRADE

## HONORABLE GREGORY W. CARMAN

| | | |
|---|---|---|
| RANCHERS-CATTLEMEN ACTION LEGAL FOUNDATION, et al., | : | |
| Plaintiffs, | : | |
| v. | : | |
| UNITED STATES, | : | Court No. 99-02-00103 |
| Defendant, | : | |
| and | : | |
| CONFEDERACIÓN NACIONAL GANADERA, | : | |
| Defendant-Intervenor. | : | |

Plaintiffs, Ranchers-Cattlemen Action Legal Foundation, move, pursuant to Rule 56.2 of the Rules of this Court, for Judgment Upon An Agency Record challenging the negative preliminary injury determination concerning live cattle from Mexico of the United States International Trade Commission (ITC) in *Live Cattle from Canada and Mexico*, 64 Fed. Reg. 3716 (Jan. 25, 1999). Plaintiffs primarily argue that the ITC misinterpreted the "compete[s] with" language in the cumulation provision under 19 U.S.C. § 1677(7)(G)(i) (1994), the ITC's determination not to cumulate cattle from Mexico and Canada was not supported by clear and convincing evidence on the record, and the ITC's negative preliminary injury determination was not based on clear and convincing evidence on the record.

Defendant, United States International Trade Commission, and defendant-intervenor, Confederación Nacional Ganadera, oppose plaintiffs' motion arguing the ITC's determination not to cumulate and the ITC's negative injury determination were based on clear and convincing evidence and therefore were not arbitrary or capricious.

*Held*: Plaintiffs' Motion for Judgment Upon An Agency Record is denied. The ITC's negative preliminary injury determination is sustained. Accordingly, the action is dismissed.

Date: November 5, 1999

*Stewart and Stewart* (*Terence P. Stewart, James R. Cannon, Jr.* and *Eric P. Salonen*), Washington, D.C., for plaintiffs.

*Lyn M. Schlitt*, General Counsel, U.S. International Trade Commission; *James A. Toupin*, Deputy General Counsel, U.S. International Trade Commission (*Robin L. Turner*), Washington, D.C., for defendant.

*Shearman and Sterling* (*Thomas B. Wilner, Jeffrey M. Winton* and *Perry S. Bechky*), Washington, D.C., for defendant-intervenor.

OPINION

**CARMAN, CHIEF JUDGE:**  Pursuant to Rule 56.2 of the Rules of this Court, plaintiffs, Ranchers-Cattlemen Action Legal Foundation (R-CALF), move for Judgment Upon An Agency Record.  Plaintiffs contest the negative preliminary injury determination concerning live cattle from Mexico of the United States International Trade Commission (ITC or Commission) in its investigation in *Live Cattle from Canada and Mexico*, 64 Fed. Reg. 3716 (Jan. 25, 1999).  This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1988).

BACKGROUND

On November 12, 1998[1], plaintiffs, R-CALF, filed petitions with the ITC and the United

---

[1]  Plaintiffs, Ranchers-Cattlemen Action Legal Foundation (R-CALF), initially filed petitions with the United States International Trade Commission (ITC or Commission) and the United States Department of Commerce alleging that the U.S. cattle industry was materially injured by reason of subsidized imports of live cattle from Canada and by reason of less than fair value imports of live cattle from Canada and Mexico on October 1, 1998.  On November 10, 1998, R-CALF withdrew the October 1, 1998 petitions, and the ITC discontinued the investigations.  *See Live Cattle from Canada and Mexico*, USITC Pub. No. 3155, at I-1 n.1, Invs. Nos. 701-TA-386 (Prelim.) and 731-TA-812-813 (Prelim.) (Feb. 1999) (*Live Cattle from Mexico*).  On November 12, 1998, R-CALF re-filed their petitions for investigations which resulted in the institution of the Commission's investigations in the above-mentioned matter.  *See id.* at I-1.  The period of investigation appears to have been from 1995 through October 1998.

States Department of Commerce alleging that the U.S. cattle industry was materially injured by reason of subsidized imports of live cattle from Canada and by reason of less than fair value imports of live cattle from Canada and Mexico. In response to the plaintiffs' petition, the ITC conducted preliminary investigations into these matters.

On January 19, 1999, the Commission reached a negative preliminary injury determination with respect to less than fair value imports from Mexico. The ITC's negative determination regarding Mexican cattle and a public version of its staff report are set forth in *Live Cattle from Canada and Mexico*, USITC Pub. 3155, Invs. Nos. 701-TA-386 (Prelim.) and 731-TA-812-813 (Prelim.) (Feb. 1999) (*Live Cattle from Mexico*). The ITC made affirmative preliminary determinations in the investigations concerning live cattle from Canada, and plaintiffs do not appeal from those determinations.

The imports at issue here concern live cattle from Mexico. There are, in general, three developmental stages for cattle prior to slaughter: (1) calves, which are raised and then weaned from their mothers at five to ten months; calves weigh up to 400-650 pounds; (2) yearling/stocker cattle, which have been weaned from their mothers and are fed on forage and roughage feeds or grazed on pasture until they are about 12-20 months old; yearling/stocker cattle generally weigh between 400 to 650-750 pounds; and (3) feeder cattle, which are kept in confined areas for 90 to 150 days and fed on finishing and high-energy rations; feeder cattle weigh up to 1,100 to 1,300 pounds. Once the cattle are sufficiently fed, they are considered fed,

_____

*See id.* at 14 n.76 (citing Table IV-2).

fat, or slaughter cattle. Fed, fat, and slaughter cattle are cattle ready for immediate slaughter.[2]

In making its preliminary injury determination concerning live cattle from Mexico, the ITC considered, among other things, issues regarding domestic like product, domestic industry, cumulation, conditions of competition, and reasonable indication of material injury or threat of material injury by reason of the subject imports from Mexico. In consideration of the domestic like product determination, the ITC considered whether live cattle in the primary stages of development should be defined as separate domestic like products from the cattle at more advanced stages of development. The ITC used a semifinished like product analysis[3] to determine whether the cattle at earlier stages of development are "like" the cattle at more advanced stages of development.

---

[2] The parties appear to agree substantially to the above-mentioned definitions concerning the primary stages of cattle development. (*See* Plaintiffs' Answers to Questions by the Court in Re: *R-CALF v. United States*, Court No. 99-02-00103 (Plaintiffs' Answers to Questions by the Court), Memorandum of Points and Authorities in Support of R-CALF's Motion for Judgment Upon the Agency Record (Plaintiffs' Mem.) at 5-6, Defendant's and Defendant-Intervenor's Joint Response to the Written Questions Presented by the Court at the Rule 56.2 Hearing and Joint Comments on the Court's "Schedule of Plaintiffs' Alleged Factual Errors by the ITC" (Def.'s and Def.-Int.'s Jt. Resp. to the Court), and Defendant United States International Trade Commission's Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record at 23-24.)

[3] The semifinished product analysis requires the ITC to examine five factors: (1) whether the upstream article is dedicated to the production of the downstream article or has independent uses; (2) whether there are perceived to be separate markets for the upstream and downstream articles; (3) differences in the physical characteristics and functions of the upstream and downstream articles; (4) differences in the costs or value of the vertically differentiated articles; and (5) significance and extent of the processes used to transform the upstream into the downstream articles. *See, e.g., Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Germany and Japan*, USITC Pub. 2988, at 6 n.23, Invs. Nos. 731-TA-736 and 737 (Final) (Aug. 1996).

Applying the semifinished like product analysis, the ITC determined that cattle at each

stage of development are dedicated to progression to the next stage and will ultimately develop

into fed cattle ready for slaughter. Thus, cattle have no independent use or function other than

being slaughtered. The ITC found, however, that cattle at different stages of production are not

functionally or economically interchangeable since at each stage prior to their final stage, they

have not reached their slaughter weight. Moreover, the ITC found that while some operations

raise cattle from birth until they are ready for slaughter, it is more common for cattle to be sold at

various stages of development. Based on these facts, the ITC defined the domestic "like

product" as encompassing all stages of development for live cattle.

In determining the scope of the domestic industry, the ITC found that the domestic

industry consists of all U.S. production of the domestic like product, live cattle.

In determining whether to assess cumulatively the volume and effect of imports from

Mexico with the imports from Canada pursuant to 19 U.S.C. § 1677(7)(G)(i) (1994)[4], the ITC

considered whether the imports competed with each other and with the domestic like product[5] in

the United States. To determine whether the imports competed with each other, the ITC applied

its traditional four-factor test: (1) the degree of fungibility between the imports from the two

---

[4] The statute states, in pertinent part, "the Commission shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which . . . petitions were filed . . . on the same day . . . if such imports compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1677(7)(G)(i) (1994).

[5] The ITC's determination concerning whether the imports of live cattle from Mexico and Canada competed with the domestic like product is not at issue in this case, and, therefore, will not be discussed in this opinion.

countries; (2) the presence of sales or offers to sell imports in the same geographic market from the two countries; (3) the existence of common or similar channels of distribution for imports from the two countries; and (4) whether the imports from the two countries were simultaneously present in the market.

In regard to the first factor, the ITC found there was not a sufficient degree of fungibility between the imports from Canada and Mexico. Based on measurement by weight, the ITC found that virtually all subject imports from Canada (95.4 percent by weight) in 1997 weighed over 320 kilograms, or more than 704 pounds, primarily fed cattle ready for immediate slaughter. In contrast, virtually all imports from Mexico (96 percent by weight) in 1997 weighed between 90-320 kilograms, or 198-704 pounds, primarily at the calf or yearling/stocker stages of development. The ITC found the live cattle that have not been fed to slaughter weight are not substitutes for cattle ready for slaughter. As the Commission found cattle in different stages of production are poor substitutes for each other, the ITC determined imports from Canada and Mexico were poor substitutes for each other. Further, the ITC found the cattle imported from Canada were more likely to be British breeds that are likely to produce higher-priced prime and choice quality grade meats. Cattle imported from Mexico, however, were usually Brahman or Brahman cross-breeds which were less likely to produce prime or choice-grade meats. For the reasons stated above, the ITC found limited fungibility existed between the imports of live cattle from Canada and Mexico.

In regard to factor two, geographic overlap, the Commission found there was limited overlap between the markets for the imports from Canada and Mexico. The majority of the

subject imports from Mexico entered into four states: Texas, California, New Mexico, and Arizona. The majority of the subject imports from Canada entered into five states: Washington, Utah, Nebraska, Colorado, and Minnesota. The imports from Canada and Mexico overlapped in only five states. Therefore, the ITC found there was limited geographic overlap between the markets for the subject imports from Canada and Mexico.

In regard to factor three, channels of distribution, the ITC found the channels of distribution for the imported cattle depended on the stage of development at purchase. The primary channels of distribution for imports from Mexico were stocker/yearling operators. The primary channels of distribution for imports from Canada were slaughterhouses or packers. Thus, the ITC found there was an insufficient degree of overlap among the channels of distribution to support a finding of competition between the subject imports.

In regard to factor four, simultaneous presence in the U.S. market, the ITC determined live cattle from Mexico and Canada were simultaneously present in the U.S. market during the period of investigation. Based on the above factors, the ITC found the subject imports from Canada and Mexico did not compete with each other, and, therefore, the ITC decided not to cumulate the imports.

In the preliminary injury determination, the ITC found there was no reasonable indication of material injury of the domestic industry by reason of the subject imports from Mexico. The ITC found that the volume and market share of the imports from Mexico were too small throughout the period of investigation to significantly affect the domestic price pursuant to 19

U.S.C. § 1677(7)(C)(ii) (1994)[6].  Specifically, the ITC found, "[t]he volume and market share of the[] [Mexican] imports [were] declining and [were] at historical low levels." *Live Cattle from Mexico* at 24.  Moreover, the prices for the cattle at the stocker and feeder stages of development in the United States "increased from 1996 to 1998." *Id*.  Thus, the ITC found the small and decreasing volume and market share of imports from Mexico had not had a significant adverse impact on the domestic industry.  The ITC attributed any weak performance in the domestic industry to the fact that the domestic industry was in the liquidation phase of the cattle cycle during the period of investigation.

Additionally, the ITC found there was no reasonable indication that the domestic industry was threatened with material injury by reason of the subject imports from Mexico.  The volume of imports from Mexico was small and decreasing over the period of investigation, and there was no indication of excess production capacity in Mexico which could further the likelihood of an increase in imports from Mexico.  Moreover, the ITC found no other adverse trends in relation to the imports from Mexico.  The ITC determined, therefore, that there was no reasonable indication of threat of material injury by reason of the subject imports from Mexico.

---

[6] 19 U.S.C. § 1677(7)(C)(ii) (1994) states, in relevant part,

In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—
        (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and
        (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

CONTENTIONS OF THE PARTIES

A.    *Plaintiffs*

Plaintiffs, R-CALF, first argue that the ITC misconstrued the cumulation provision of 19 U.S.C. § 1677(7)(G)(i).  Plaintiffs contend that the ITC equated "competition" with product "fungibility," "thereby foreclosing from consideration other evidence of competition between imports."  (Memorandum of Points and Authorities in Support of R-CALF's Motion for Judgment Upon the Agency Record at 16 (Plaintiffs' Mem.).)  Consequently, plaintiffs allege, the ITC never took into account facts which showed a reasonable degree of overlap of competition existed between the imports from Mexico and Canada.

Plaintiffs argue that the high standard the ITC used for determining whether the imports from Canada and Mexico compete is contrary to the statute and Congressional intent.  According to plaintiffs, the language of the statute merely requires that the products imported from various countries "compete with" each other, not that they be directly interchangeable upon importation. Further, plaintiffs argue, the legislative history makes it clear that "competition" can exist on many levels and that Congress intended cumulation to be applied broadly in "'an effort to make the application of the injury analysis more realistic . . . .'"  (Plaintiffs' Mem. at 24 (emphasis omitted) (quoting H. REP. NO. 100-40, Part I, 100th Cong., 1st Sess. (1987) at 130).)  In contrast, plaintiffs argue, the ITC's construction of the law here limits the analysis as to whether imports are fungible upon entry.  Such a narrow interpretation, plaintiffs contend, is erroneous and not subject to deference by the Court.  Moreover, such a narrow interpretation of the statutory language is contrary to the statutory scheme as a whole.

Plaintiffs also argue that the ITC departed from long-standing agency practice of cumulating finished and unfinished products when it failed to cumulate the subject imports. Plaintiffs argue the ITC has routinely cumulated imports from multiple countries where imports from one country have entered the United States at a different stage of development or production than imports from another country but where both products were intended for the same end use. The ITC's abrupt and unexplained departure from prior ITC practice regarding cumulating finished and unfinished products, according to plaintiffs, was arbitrary and capricious and an abuse of discretion.

Plaintiffs additionally argue that the ITC inappropriately used a different and more rigorous standard of interchangeability for cumulation than it used to define like product. Plaintiffs point to comments from two Commissioners and at least one judicial opinion from this Court to support their argument that the application of different standards of interchangeability for cumulation and like product is in error. Due to this arbitrary application of different standards of interchangeability, plaintiffs argue, the ITC's determination must be reversed.

Plaintiffs also argue that the agency's finding that imports from Canada and Mexico do not compete is not supported by clear and convincing evidence. First, plaintiffs argue the ITC's decision not to cumulate because of the insufficient fungibility of imports is contrary to the ITC's past practice. According to plaintiffs, "the ITC has never declined to cumulate imports in a preliminary injury investigation due to inadequate fungibility." (Plaintiffs' Mem. at 32 (emphasis omitted).) Plaintiffs argue because the ITC has never declined to cumulate by reason of inadequate fungibility, the ITC's decision in this case goes against long-established agency

practice.

Second, plaintiffs argue, the ITC's finding regarding cumulation rests on erroneous statements of fact and therefore does not comply with the clear and convincing evidence standard required for preliminary determinations. According to plaintiffs, the ITC erred in concluding "'there appears to be no direct relationship between the prices for stocker/feeder cattle . . . and fed cattle ready for slaughter,'" (Plaintiffs' Mem. at 34 (quoting *Live Cattle from Mexico* at 24-25)), as there is evidence to the contrary.[7]

Plaintiffs further contend the ITC erred in concluding that "'the purchasers, and thus the channels of distribution, vary depending on the stage of [development of the cattle].'" (Reply to Opposition of Defendant and Defendant-Intervenors to Plaintiffs' Motion for Judgment Upon the Agency Record (Plaintiffs' Reply) at 3 (brackets in original) (quoting *Live Cattle from Mexico* at 14).) Such a statement is erroneous, plaintiffs allege, as there is evidence to the contrary. Specifically, there is evidence in the record that "*feedlots* may acquire *stocker cattle* as well as *feeder cattle* and that *packers* (i.e., the slaughterhouses) may acquire *feeder cattle* as well as *fed cattle* ready for slaughter." (Plaintiffs' Reply at 3.) As there is evidence that some purchasers acquire cattle at more than one stage of development, plaintiffs argue, the ITC's premise is

_____

[7] The Court recognizes that this alleged error appears in the material injury section of the ITC's determination as published in *Live Cattle from Mexico* rather than in the cumulation section. The Court, however, places this argument as it appears in plaintiffs' memorandum of law. (*See* Plaintiffs' Mem. at 34.) The issue is additionally addressed in the material injury discussion of plaintiffs' contentions as plaintiffs also raise the issue under the material injury section of their reply brief. (*See* Reply to Opposition of Defendant and Defendant-Intervenors to Plaintiffs' Motion for Judgment Upon the Agency Record at 20.) The Court addresses plaintiffs' price contention under the material injury section of this opinion only.

factually wrong and its conclusion reversible error.

An additional factual error, according to plaintiffs, concerns the ITC's analysis of the geographic overlap of imports. According to the ITC, "[i]mports of Canadian and Mexican cattle overlap in only five states (Colorado, Indiana, Kansas, Nebraska, and Texas)." *Live Cattle from Mexico* at 13. According to plaintiffs, the ITC committed error in finding imports from Mexico and Canada overlapped in Indiana, rather than in Idaho. Plaintiffs argue the misidentification of Indiana is not a "harmless" error because, unlike Indiana, Idaho borders Canada. Thus, the ITC's analysis regarding geographic overlap was in error.

Third, plaintiffs argue, the ITC's determination regarding cumulation lacks sufficient thoroughness, reflects uncertainty, and betrays fundamental misunderstandings about the industry. The agency's cumulation determination, therefore, is not supported by clear and convincing evidence and should be reversed and remanded. Specifically, plaintiffs argue the ITC failed to appreciate the national nature of the U.S. cattle market and therefore did not recognize the potential impact any geographic overlap among the imports from Canada and Mexico might have had on the national market. Further, the agency did not recognize the significance of the states in which the imported cattle overlap. According to plaintiffs, the overlapping states cited by the ITC account for seventy-one percent of total cattle on feed in the United States. Further, plaintiffs argue, the ITC failed to thoroughly analyze the overlap of imports of stocker and feeder cattle from the importing countries, as the Commission parsed the imports of stocker and feeder cattle by weight instead of by head count. Given the nature of the ITC's analysis in this case, plaintiffs contend, the decision should be reversed and remanded.

Additionally, plaintiffs argue the ITC's negative preliminary injury determination, including considerations of import volume, price, and impact, failed to satisfy the clear and convincing standard and therefore was contrary to law. Concerning the volume of imports, plaintiffs contend the ITC focused erroneously on the decline in imports from 1995. Rather, plaintiffs argue, the ITC should have focused on the dramatic increase in imports from Mexico between the second and third years of the period of the investigation. Plaintiffs argue that as the ITC admits "'even relatively small volumes' of imports 'can have significant price effects in this price-sensitive market,'" it should have taken into account the rapid increase in imports from Mexico from 1996 to 1997. (Plaintiffs' Mem. at 46 (quoting *Live Cattle from Mexico* at 20).)

Concerning price, plaintiffs argue in their reply brief the ITC concluded in error that "'there appears to be no direct relationship between the prices for stocker/feeder cattle . . . and fed cattle ready for slaughter.'" (Plaintiffs' Reply at 20 (quoting *Live Cattle from Mexico* at 24-25).) This statement was erroneous, assert plaintiffs, because there was unrebutted evidence to the contrary. Such evidence included testimony that low fat cattle prices were depressing prices for stocker and feeder cattle and that the price of yearling/stocker cattle was a direct function of the cost of feed and the rate of fat cattle. Further, economic analysis showed there was a direct effect of imported feeder cattle on the price of feeder and fat cattle in the U.S. as well as a direct effect of imports of fat cattle on fat and feeder prices in the United States. Therefore, plaintiffs contend, the assumption that prices at different stages of development are not related is factually wrong.

Also concerning price, plaintiffs contend that the Commission incorrectly relied on the

absence of evidence of underselling by imports from Mexico whereas it discounted the evidence regarding the presence of underselling by imports from Canada. Moreover, plaintiffs point out that the ITC focused on two different time periods in its analysis of trends in import volumes and prices. According to plaintiffs, the ITC focused on the overall change in import volumes from 1995 to 1997 and on domestic prices between 1996 and 1998. Plaintiffs argue the use of different time periods is arbitrary and capricious. Plaintiffs also point to evidence which appears to contradict the ITC's finding that U.S. stocker prices increased between 1996 to 1998. Further, plaintiffs point to a statement by the ITC indicating supplies of U.S. feeder cattle in connection with imports of feeder cattle from Mexico in 1995 "'contributed to the *decline in feeder cattle prices [in 1996].*'" (Plaintiffs' Mem. at 48 (citing Cattle and Beef: Impact of the NAFTA and Uruguay Round Agreements on U.S. Trade, USITC Pub. 3048, at 2-16 (July 1997), AR Doc. 232, *in* Appendix of Public Record Documents to Accompany Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record (Plaintiffs' App.).) Plaintiffs question the ITC's apparent lack of explanation for its departure from the earlier finding.

Concerning impact, plaintiffs contend the ITC failed to explain why economic analysis that provided quantitative estimates of the financial impact of Mexican imports on domestic producers did not have a significant adverse impact in the U.S. Moreover, plaintiffs argue, the ITC failed to explain in the case at bar why the industry's weak performance was attributed to the industry's "'liquidation phase of the cattle cycle'" rather than to the imports from Mexico as had occurred with the Canadian case. (Plaintiffs' Mem. at 49 (quoting *Live Cattle from Mexico* at 26).) Such analysis, plaintiffs contend, does not comport with the clear and convincing standard required of preliminary determinations.

Plaintiffs further contend that the ITC failed to consider what additional information on competition between imports would be collected in the final investigation.  According to plaintiffs, the ITC relied heavily on secondary evidence, while only relying on a small sampling of primary evidence.  Moreover, the primary evidence mainly consisted of limited responses to importer questionnaires.  In a final review, plaintiffs contend, the ITC likely would be able to collect information which could support a contrary outcome regarding cumulation and injury.

B.      *Defendant*

Defendant, United States International Trade Commission, argues the Commission's determination not to cumulate subject imports was based on clear and convincing evidence and therefore was not arbitrary or capricious and was otherwise in accordance with law.  Defendant also asserts the plaintiffs' arguments inappropriately invite the Court to conduct a *de novo* review of the evidence and to substitute the Court's judgment for that of the Commission, a review unsupported by case law.  Additionally, the Commission contends that, contrary to plaintiffs' allegations, the ITC conducted a thorough analysis of the evidence, using traditional cumulation factors, to determine whether the subject imports from Canada and Mexico competed with each other and rationally determined, based on the evidence before it, that they did not.

Specifically, the ITC contends that this Court and Congress have affirmed the Commission's practice of considering four factors to assess whether subject imports compete with each other for the purposes of determining whether to cumulate imports.  These factors are: (1) the degree of fungibility between the imports from different countries and between imports and the domestic like product; (2) the presence of sales or offers to sell in the same geographic

markets of imports from different countries and the domestic like product; (3) the existence of common or similar channels of distribution for imports from different countries and the domestic like product; and (4) whether the imports are simultaneously present in the market. According to defendant, the ITC used these factors as prescribed by law and, based on an independent evaluation of the factors with respect to each economic situation, made its competition determination.

The Commission also argues both the Courts and Congress have endorsed the Commission's practice of finding competition between the subject imports only where there is a "reasonable overlap" in competition between the subject imports. In applying this standard to the four-factor test, the ITC argues it found no reasonable overlap in competition between cattle imported at different stages of development. Further, the Commission argues that although it may not have specifically addressed plaintiffs' arguments that the market for live cattle is national, the Commission is presumed to have considered all evidence in the record, and it is not required to comment on every piece of evidence presented by the parties.

The ITC additionally argues it followed established practice in reaching its final determination. Contrary to plaintiffs' argument, the ITC contends it is established practice to analyze the facts of each case in terms of the factors customarily used in a cumulation analysis. For example, the Commission has not cumulated imports from multiple countries where, as here, imports from multiple countries were different products with very little overlap in competition between respective imports. In contrast, where imports from one country were the same products as those imported from another country, the ITC has cumulated the products. In accordance with

established practice, defendant argues, the ITC here correctly made its cumulation determination based on the specific facts in the record.

The Commission next argues it reasonably found that the evidence relating to its traditional four-factor test clearly and convincingly supported a decision not to cumulate subject imports from Mexico and Canada. First, concerning fungibility, the ITC argues it correctly found there was not a sufficient degree of fungibility based on the facts underlying the investigations. Specifically, the Commission found there are distinct developmental stages for cattle: calf stage, stocker/yearling stage, and feeder stage. The Commission found the transformation from calf to fed cattle to be significant, given the fact the animal doubles or triples in size from a weaned calf of 400 pounds to a slaughter weight of 1,200 pounds. The Commission found subject imports from Mexico differ in their developmental stages from the imports from Canada. For example, official import statistics show that virtually all cattle from Mexico (96 percent by weight) in 1997 were cattle weighing between 90-320 kilograms, or 198-704 pounds, primarily corresponding with the calf or stocker stage of development while virtually all cattle from Canada (95.4 percent by weight) in 1997 weighed over 320 kilograms, or more than 704 pounds, primarily fed cattle ready for immediate slaughter. The Commission found, based on this evidence, that the imports from Mexico and Canada were imported at different stages of development.

The ITC argues it further found that live cattle which have not been fed to slaughter "are not substitutes for cattle ready for immediate slaughter." (Defendant United States International Trade Commission's Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the

Agency Record (Def's Mem.) at 28.) Specifically, the ITC found that cattle not at the slaughter stage will not produce the same type of marketable beef in terms of quality and sized pieces. The Commission found because cattle in different stages of development are poor substitutes for each other, the imports from Canada and Mexico are poor substitutes for each other as well.

The ITC also argues it found that there were differences in the breeds, condition/health, and individual genetics among the subject imports from Mexico and Canada which may affect the quality grade of the meat the animals produce. According to the ITC, the evidence showed that cattle imported from Canada tended to be British breeds (*e.g.*, Angus, Hereford) that are likely to produce high-priced and choice quality grade meat. Subject imports from Mexico, on the other hand, were usually Brahman or Brahman cross-breeds which are less likely to produce prime or choice grade meats. Based upon evidence showing distinctions among levels of development of the cattle, differences in the quality of meat produced at the various stages of development of the cattle, and differences in the breeds of the cattle imported from Canada and Mexico, the Commission contends it was reasonable for the ITC to find no fungibility existed among the subject imports from Canada and Mexico.

Further, defendant argues, the inquiry concerning fungibility for the purposes of cumulation differs from an inquiry into fungibility in another context. According to defendant, "[t]his Court repeatedly has held that 'like product, cumulation, and causation are functionally different inquiries because they serve different statutory purposes. As a result, each inquiry requires a different level of fungibility.'" (Def.'s Mem. at 29 (quoting *BIC Corp. v. United States*, 964 F. Supp. 391, 399 (CIT 1997) (citation omitted)).) Thus, the fact that the ITC found

one like product at all stages of cattle development does not negate its finding that the subject

imports from Mexico and Canada for cumulation purposes are not fungible. Moreover,

defendant argues, the ITC did not find the products to be interchangeable for the like product

analysis in this instance. Thus, its finding regarding interchangeability in its domestic like

product determination is consistent with its finding concerning fungibility in its cumulation

determination.

Second, the Commission argues it reasonably found there was only limited geographic

overlap between the subject imports from Mexico and Canada as there were only five states in

which the subject imports overlapped. Moreover, although the ITC acknowledges it

misidentified Indiana rather than Idaho as one of the five overlapping states, the ITC argues the

misidentification was harmless. Defendant argues the misidentification caused no change in the

total import data only in the identification of the name of the state. Further, the import data for

Idaho evidenced a lower degree of overlap between Canadian and Mexican imports than the

comparison based on data from Indiana. Despite the error, defendant argues, its conclusions

were supported by evidence in the record, and defendant had a rational basis for its conclusion.

Third, defendant argues its determination regarding channels of distribution was correct

as the Commission found the purchasers, and thus the channels of distribution, vary depending

on the stage of development of the cattle. According to defendants, the channels of distribution

for cattle weighing under 650 pounds are backgrounding or stocker/yearling operations. On the

other hand, defendant argues, cattle ready for slaughter are purchased by the packers or their

order buyers. As virtually all subject imports from Mexico are imported at the stocker/yearling

stage of development and as virtually all subject imports from Canada are imported at the slaughter stage, the subject imports from each country entered through different channels of distribution. Thus, the Commission argues, it reasonably found that imports from Canada and Mexico enter the U.S. through different channels of distribution as they are at different stages of development. As the ITC found the subject imports from Mexico and Canada were insufficiently fungible and the channels of distribution of the subject imports were different because the imports enter at different stages of development, it was reasonable, the ITC argues, for the ITC to find there was no reasonable overlap of competition between imports from Canada and Mexico.

Next, the ITC contends the Commission's negative injury determination regarding imports of live cattle from Mexico was not arbitrary or capricious and was otherwise in accordance with law. In making its determination, defendant argues, the Commission properly considered the volume of the subject imports, their effect on prices for the domestic like product, and their impact on domestic producers of the domestic like product. Given these considerations, the ITC contends it reasonably concluded that clear and convincing evidence supported a negative injury determination.

Specifically, the ITC argues it reasonably concluded based on the small volume of subject imports from Mexico and the Mexican imports' small share of the U.S. market that the volume of imported cattle from Mexico was not significant. The ITC found the volume and market share of subject imports from Mexico were small over the period of investigation. Moreover, the Commission contends, the quantity of imports by weight and by head decreased over fifty percent since 1995, and despite some increases in imports from Mexico during the interim

period, the imports remained at historically low levels. Furthermore, defendant found the number of Mexican imports held a small and decreasing share of the U.S. market, declining from 1.7 percent in 1995 to 0.5 percent in 1997 and 1998.[8] Although the ITC acknowledges imports from Mexico were at their highest in 1995, defendant argues this high volume of imports was an aberration attributable to the drought in Mexico at the time and that the Commission reasonably chose to focus on the small volume of imports over the period of the investigation. Such facts, defendant contends, reasonably constitute clear and convincing evidence that the volume of subject imports from Mexico was not significant.

Defendant additionally argues the Commission reasonably concluded that the insignificant volume of imports from Mexico has not adversely affected domestic prices to a significant degree in accordance with the requirements under 19 U.S.C. § 1677(7)(C)(ii). Defendant states it focused its determination of the price effects of imported cattle from Mexico on the historically low and declining levels of imports from Mexico. Further, the ITC contends it found the prices for stocker and feeder cattle in the U.S. market increased from 1996 to 1998. As the ITC found no direct relationship between the pricing data for stocker/feeder cattle and for fed cattle ready for immediate slaughter, the Commission argues it reasonably found the insignificant volume of Mexican imports did not adversely affect domestic prices to a significant degree.

The Commission also asserts plaintiffs' contention that the Commission used different time periods for analyzing price and volume in its material injury determination is inaccurate.

[8] The percent by weight for 1997 and 1998 refers to the interim periods, January to October 1997 and 1998.

Rather, defendant argues, it considered data over the entire period of the investigation concerning both volume and price for both Canada and Mexico. Therefore, the ITC contends, it did consider data over the entire period of the investigation for both the import volume and price sections of the determination.

The ITC additionally argues the Commission reasonably concluded based on the record that the subject imports from Mexico have not had a significant adverse impact on the domestic industry of live cattle. The Commission contends it was reasonable for it to conclude the imports from Mexico did not have a significant adverse impact on the domestic industry because it found the subject imports held only a small and declining share of the U.S. industry. Moreover, the Commission also found that the cattle industry's weak performance represented a normal cyclical downturn expected during the liquidation phase of the cattle cycle. Because of the small volume of imports and the nature of the industry's cycle during the period of investigation, the ITC argues it reasonably concluded that the cattle industry's downturn was not exacerbated by the insignificant volume of Mexican imports.

The Commission's final argument is that no likelihood exists that contrary evidence would arise in a final investigation in accordance with the requirements of 19 U.S.C. § 1673b(a) (1994)[9], as interpreted by the ITC and upheld by this Court. *See American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed. Cir. 1986). The Commission argues it relied on complete data

---

[9] 19 U.S.C. § 1673b(a) (1994) states, in pertinent part, that in making its preliminary determinations, the Commission "shall determine, based on the information available to it at the time of the determination, whether there is a reasonable indication that . . . an industry in the United States . . . is materially injured, or . . . is threatened with material injury . . . ."

for its determination. Although the ITC acknowledges it used primarily secondary sources to reach its negative injury determination, the ITC asserts such a reliance was reasonable given the extremely large and dispersed nature of the domestic live cattle industry. Further, as the ITC had complete, comprehensive, and reliable information for its secondary sources (*e.g.*, data compiled by the U.S.D.A. and official import statistics), there is no evidence these sources would change or add more information in the near future. Moreover, defendant argues, plaintiffs supported the use of secondary sources and did not challenge the methodology for obtaining the information nor the sufficiency of it during the course of the ITC's investigation. As a result, the Commission asserts, the plaintiffs cannot now complain about the Commission's methodology.

C.      *Defendant-Intervenor*

Defendant-Intervenor, Confederación Nacional Ganadera (CNG), contends the plaintiffs, through their argument, have improperly asked the Court to depart from the established standard of review. CNG asserts the plaintiffs argue the Commission erred, not by not having sufficient evidence on the record to make its determination, but rather because it analyzed the evidence in a neutral and balanced manner. Thus, plaintiffs essentially ask for reversal because the ITC did not analyze the evidence in light more favorable to the petitioners. CNG contends, however, that the Commission acted entirely properly in weighing the evidence before it and resolving conflicts within the evidence before making its determination. Moreover, CNG argues, plaintiffs have not shown that the decision lacked a rational basis in fact. Accordingly, CNG contends, the appeal must be dismissed.

Next, CNG argues the Commission correctly decided not to cumulate subject imports

from Mexico and Canada. According to CNG, the Commission's decision not to cumulate flowed from its determination that the imports from Mexico and Canada do not compete. As the determination was based on facts well-supported by the evidence on the record, the Commission's determination, CNG contends, should be affirmed.

Specifically, CNG argues, the Commission properly employed its traditional four-factor test, which has been approved by this Court and the Federal Circuit Court of Appeals, to determine whether the subject imports from Mexico and Canada compete pursuant to 19 U.S.C. §§ 1677(7)(G)(i) and 1677(7)(H) (1994). In applying its test, CNG asserts, the Commission considered all four factors. Because three of the four factors weighed against a finding of competition, CNG argues, for reasons substantially similar to those of the defendant, the Commission reasonably concluded there was no reasonable degree of overlap in competition between the imports from Canada and Mexico.

Further, CNG asserts, plaintiffs' argument that the subject imports from Mexico and Canada do compete is without merit. Specifically, CNG states the statute does not require, as plaintiffs appear to contend, that the Commission consider whether the imported products will compete with each other at some point in the future. Rather, CNG argues, the statute focuses on whether the imports compete. Such a requirement focuses the analysis on the level of competition at the stage of development in which the subject merchandise is imported. Alternatively, CNG argues, even if the statute did not require the Commission to consider competition in terms of the condition of the imports at importation, there is nothing within the statute which would forbid the ITC from considering competition at that time. Thus, CNG

contends, the Commission did not commit legal error in choosing not to consider future competition between the subject imports.

CNG additionally asserts the plaintiffs' argument concerning finished and unfinished products is without merit. Specifically, CNG asserts that the comparison to which plaintiffs refer, primarily the *Pipe Fittings*[10] case, involves a transformation process which is relatively simple, adds relatively little value, and can be accomplished in a fairly short period of time. By contrast, CNG contends, the process for transforming stockers into fed cattle involves a substantially longer and more complicated process. The process for transforming stockers into fed cattle nearly doubles the weight and value of the cattle.

Moreover, defendant-intervenor argues, the companies which purchase the semifinished products in this case differ from those in *Pipe Fittings*. Whereas in *Pipe Fittings* the same companies that purchased semifinished pipe fittings also produced the finished merchandise, here, CNG alleges, the companies which purchase the Mexican stockers do not generally sell the finished product in competition with slaughter-ready cattle from Canada. Rather, the Mexican stockers are sold to fed lots which in turn usually sell the cattle to slaughterhouses in competition with imports from Canada. Thus, CNG argues, it was reasonable for the Commission to conclude the cattle in this case were not analogous to the pipes in the *Pipe Fittings* case.

---

[10] In its discussion, CNG appears to be referring to *Certain Carbon Steel Butt-Weld Pipe Fittings from China and Thailand*, USITC Pub. 2401, Invs. Nos. 731-TA-520 and 521 (Prelim.) (July 1991).

Defendant-Intervenor further argues the Commission's decision to treat all cattle as one domestic like product did not require it to treat all cattle as fungible in its cumulation determination. As a matter of law, defendant-intervenor argues, the Commission's like product determination cannot dictate the result of the cumulation analysis as the like product analysis is based upon a different statute and purpose than the cumulation analysis. Moreover, CNG argues the Commission's decision was entirely consistent in that it found stockers were not interchangeable with fed cattle in its like product analysis as well as its cumulation analysis.

CNG additionally argues the confusion between Idaho and Indiana in the Commission's staff report was at worst harmless error. In support of its argument, CNG states virtually all Mexican cattle imported in the United States were destined for four states (*i.e.*, Texas, New Mexico, California, and Arizona) whereas less than one percent of the cattle imported from Canada were shipped to Texas, New Mexico, California, and Arizona. Such evidence supports, CNG argues, the Commission's finding there was only a limited degree of geographic overlap.

CNG further argues the fact that subject imports from Mexico and Canada were simultaneously present in the U.S. market does not, by itself, require cumulation. As the Commission must consider all four factors in determining whether subject imports compete with each other, CNG argues it would not be reasonable for the Commission to depart from established practice and give undue weight to only one factor. Consequently, the Commission's decision that the subject imports did not compete with each other was reasonable.

CNG's final argument is that the Commission correctly determined that there is no

reasonable indication that the domestic industry is injured or threatened with material injury by reason of the imports from Mexico. First, CNG argues, the Commission properly concluded that the volume of imports from Mexico was small, declining, and below historical levels as there was evidence on the record to support these findings. Instead of examining a small window of time, as the plaintiffs argue, CNG contends the Commission properly considered overall trends of imports from Mexico. Such an analysis, CNG asserts, was appropriate given the low level of imports in 1996 following an extremely high level of imports in 1995 due to a drought in Mexico. Consequently, CNG argues, the small increase in imports from Mexico in 1997 was a move towards more normal levels rather than an indication of injury to the U.S. industry.

Second, CNG argues the Commission properly concluded that imports from Mexico were too small to have an effect on price. In contrast to plaintiffs' argument that the Commission failed to consider the price-sensitive nature of the cattle industry, CNG contends the Commission specifically considered whether the commodity nature of the industry might magnify the price effects of the Mexican imports. Based on evidence on the record, CNG asserts, the Mexican imports were too small to have a meaningful effect on prices, even given a commodity market in which relatively small volumes have significant effects on price.

Further, CNG argues plaintiffs' contention that the Commission's decision incorrectly relied on the absence of evidence of underselling by imports from Mexico misses the point. According to CNG, when analyzing the price effects of imports from Mexico, the Commission found no other evidence suggested the imports from Mexico had affected U.S. prices. Such a finding, CNG contends, was important here because there was no evidence at all that the imports

from Mexico affected U.S. prices.

CNG also contends plaintiffs' allegation that the Commission improperly considered limited years for price trends is without merit. The Commission only focused on the U.S. prices during 1996-1998 because these were the only years within the period of investigation in which the imports from Mexico increased. This period, then, is the only relevant period to examine when analyzing whether imports from Mexico were depressing the U.S. market prices. As there was evidence to support the Commission's finding that the U.S. prices did not decrease while the imports from Mexico increased, CNG argues, there was a rational basis for the Commission's finding that imports from Mexico did not affect U.S. market prices.

Third, CNG contends the ITC correctly concluded that imports from Mexico did not have an adverse impact on the U.S. industry as the ITC's decision was based on evidence that there was a low volume and decreasing share of subject imports from Mexico. Moreover, CNG argues plaintiffs' assertion that the Commission's analysis of the impact of imports from Mexico was flawed because it did not accept plaintiffs' models which calculated that imports from Mexico had caused a 3.7 percent decline in U.S. feeder price, is without merit. According to CNG, the Commission did not have to accept plaintiffs' models; moreover, the evidence showed the prices for the type of cattle imported from Mexico had increased. Thus, according to CNG, the plaintiffs' model was inconsistent with evidence on the record, and plaintiffs' suggestion that the ITC should accept the theoretical modeling is wrong.

Finally, CNG argues there was no reason to believe the Commission would have

discovered contrary evidence in the final investigation, and plaintiffs fail, in their brief, to identify contrary evidence that would likely arise. Thus, according to CNG, whatever additional information which might have been found would not have disturbed the Commission's determination.

STANDARD OF REVIEW

This Court shall hold unlawful any preliminary determination, finding, or conclusion made by the Commission which it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 19 U.S.C. § 1516a(b)(1)(A) (1994). For this purpose, the Court must determine whether there is a "'rational basis in fact'" for the ITC's determination. *See Torrington Co. v. United States*, 16 CIT 220, 221, 790 F. Supp. 1161, 1165 (1992) (quoting *American Lamb*, 785 F.2d at 1004 (quoting S. REP. NO. 249, *reprinted in* 1979 U.S.C.C.A.N. 381, 638)). The ITC, when making its determination, must decide whether there is a reasonable indication for finding "(1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation." *American Lamb*, 785 F.2d at 1001.

In determining whether the ITC's approach is in accordance with law, this Court applies the two-step analysis articulated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). *Chevron* requires the reviewing court to give effect to the intent of Congress if Congress has directly spoken to the precise question at issue and Congress's intent is clear. *See id*. If, however, Congress has not spoken directly to the issue at bar, the question for the court is whether the agency's interpretation of that issue "is based on a

permissible construction of the statute." *Id.* at 843. In reviewing the ITC's interpretation, this Court "'may reject . . . that [which] contravenes clearly discernible legislative intent,' but '[the Court's] role when that intent is not contravened is to determine whether the agency's interpretation is "sufficiently reasonable."'" *Grupo Indus. Camesa v. United States*, 853 F. Supp. 440, 442 (CIT 1994) (quoting *American Lamb,* 785 F.2d at 1001 (citations omitted)).

The Court need not conclude the Commission's construction is the only interpretation the agency could have adopted, or even the interpretation the Court would have reached if the question initially had arisen in a judicial proceeding before it. *See Chevron*, 467 U.S. at 843 n.11. Rather, the focus of the inquiry is whether the Commission's interpretation of the statute is sufficiently reasonable to be accepted by the Court. *See FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 39 (1981).

DISCUSSION

A.    *Clear and Convincing Standard*

Plaintiffs assert that the Commission's preliminary determination was arbitrary, capricious, an abuse of discretion, and not in accordance with law because it was not supported by clear and convincing evidence in the record. Plaintiffs contend, in part, that the Commission erred by making its determination based on contradictory data in the record and acted arbitrarily in ignoring evidence clearly supporting an affirmative determination.

It has long been established that in applying the statutory standard for making a preliminary determination regarding material injury or threat of material injury, the Commission

may weigh all evidence before it and resolve conflicts in the evidence. *See, e.g., American Lamb*, 785 F.2d at 1002-04. In asserting that the evidence supporting the Commission's determination is not clear and convincing because of the conflicting evidence, plaintiffs, in essence, request the Court to reweigh the evidence. The Court cannot substitute its judgment, however, for that of the Commission. Rather, its role in reviewing a decision by the ITC is to ascertain whether there was a rational basis for the determination. *See, e.g., Torrington*, 790 F. Supp. at 1167 (citing *American Lamb*, 785 F.2d at 1004). The Court may only reverse the ITC's determination if there is a "clear error" of judgment and where there is "no rational nexus between the facts found and the choices made." *See Connecticut Steel Corp. v. United States*, 852 F. Supp. 1061, 1064 (CIT 1994) (quotations and citations omitted).

B.    *Cumulation*

In making its preliminary injury determination, the ITC "shall cumulatively assess" the volume and effect of imports of the subject merchandise from all countries for which petitions are filed and/or investigations are self-initiated by the administering authority on the same day if such imports "compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1677(7)(G)(i).[11] In order to satisfy this provision, the ITC must, in part, determine that "a 'reasonable overlap' in competition" exists between the imports from the different countries. *Wieland Werke, AG v. United States*, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989) (quoting *Granges Metallverken AB v. United States*, 13 CIT 471, 475, 716 F. Supp. 17, 22

---

[11]  19 U.S.C. § 1677(7)(G)(i) specifically states, in relevant part, "the Commission shall cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which . . . petitions were filed . . . on the same day . . . if such imports compete with each other and with domestic like products in the United States market."

(1989)).

In evaluating whether imports from different countries compete with each other,[12] the ITC relies on the following four-factor test: (1) the degree of fungibility between the imports from different countries; (2) the presence of sales or offers to sell imports from different countries in the same geographic markets; (3) the existence of common or similar channels of distribution for imports from different countries; and (4) whether the imports are simultaneously present in the market. *See, e.g., Id.* at 52; *Fundicao Tupy S.A. v. United States*, 12 CIT 6, 10-11, 678 F. Supp. 898, 902 (1988). "While no single factor is determinative, and the list of factors is not exclusive, these factors are intended to provide the Commission with a framework for determining whether the imports compete . . . ." *Goss Graphics Sys., Inc. v. United States*, 33 F. Supp. 2d 1082, 1086 (CIT 1998) (citations and quotation omitted).

### 1. *Competition*

One of plaintiffs' core arguments appears to be that the ITC's requirement that subject imports be directly interchangeable *at importation* in order to cumulate the subject imports is contrary to statute and Congressional intent. The plaintiffs' contention, however, is without merit. The plaintiffs' concern essentially involves a question of statutory interpretation. In resolving questions of statutory interpretation, *Chevron* requires this Court first to determine whether the statute is clear on its face. If the language of the statute is clear, then this Court must

[12] Since there is no dispute that Canadian and Mexican cattle competed with the domestic like product, this issue in this opinion is limited to review of the ITC's determination that Mexican cattle do not compete with cattle imported from Canada.

defer to Congressional intent. *See Chevron,* 467 U.S. at 842-43. If the statute is unclear, however, then the question for the Court is whether the agency's answer is based on a permissible construction of the statute. *See id.* at 843; *see also Corning Glass Works v. United States Int'l Trade Comm'n*, 799 F.2d 1559, 1565 (Fed. Cir. 1986) (finding the Commission's definitions must be "*reasonable* in light of the language, policies and legislative history of the statute.").

Here, the statutory provision regarding cumulation is unclear. The statute provides, in relevant part, that the Commission shall "cumulatively assess the volume and effect" of the imports of the subject merchandise from all countries if "such imports compete with each other and with domestic like products" in the U.S. market. 19 U.S.C. § 1677(7)(G)(i). To include imports in the cumulation equation, the statute requires, among other things, that they "compete with" each other and domestic like products, but it fails to define that phrase. *See Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1101 (Fed. Cir. 1990). Accordingly, the provision cannot be said to have a plain meaning. *See id.*

What Congress intended by the phrase "competes with" is not immediately clear from the legislative history of this provision, first added to the law in the Trade and Tariff Act of 1984, Pub. L. No. 98-573, § 612, 98 Stat. 2948, 3033. *See id*. The Court must, therefore, consider the purpose for enacting the cumulation provision to discern its intended meaning. *See id.*

Cumulation was mandated "to eliminate inconsistencies in Commission practice and to ensure that the injury test adequately addressed *simultaneous* unfair imports from different countries." House Comm. on Ways and Means, Trade Remedies Reform Act of 1984, H.R. REP.

No. 98-725, at 37 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5127, 5164 (emphasis added). The legislative history's only explicit guidance is that cumulation is designed to take into account "simultaneous unfair imports." *Id.* Because neither the statutory language nor the legislative history conclusively establishes the intended time frame in which the imports are to be considered for competition, the Court assesses the agency's interpretation of the provision to determine whether the agency's interpretation is reasonable and in accordance with the legislative purpose.

In making its competition determination, the Commission found there was insufficient evidence on the record to support a finding of competition between the subject imports from Mexico and Canada in part because when the subject imports were brought into the United States, they were imported at different stages of development. *See Live Cattle from Mexico* at 12. The Commission, therefore, appears to have considered whether the subject imports "competed with" one another at the moment of importation.

Although the statute does not specifically direct the ITC to consider whether the products at issue compete *at importation*, the statute does require that the Commission determine whether the "*imports* compete." As products are U.S. imports when they are "brought in[to] [the United States] from an outside source," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1135 (Phillip Babcock Gove, ed., Merriam-Webster, Inc., 1986) (1961), consideration by the ITC of whether subject imports compete *at importation* appears to be a reasonable interpretation of the statute. Certainly nothing within the statute *precludes* the ITC from considering competition in terms of the condition of the products at importation. Accordingly, this Court defers to the agency's interpretation of the statute. *See Zenith Radio Corp. v. United States*, 437 U.S. 443, 450-

51 (1978) (agency's interpretation of the statute under which it operates is entitled to some

deference).

2.      *Application of four-factor competition test*

a.      *Fungibility*

i.      *Fungibility as a factor of competition*

Plaintiffs argue the ITC misconstrued the cumulation provision and equated "fungibility"

with "competition."  Plaintiffs' argument appears, in part, to challenge the ITC's use of

"fungibility" as a factor in assessing whether the subject imports compete with each other.  This

Court, however, has consistently affirmed the Commission's practice of considering four

factors—one of which is the degree of fungibility—to assess whether subject imports compete

with each other.  *See, e.g., Goss Graphics*, 33 F. Supp. 2d at 1086; *Weiland Werke*, 718 F. Supp.

at 52; *United States Steel Group v. United States*, 18 CIT 1190, 1199-1200, 873 F. Supp. 673, 685

(1994); *United Eng'g & Forging v. United States*, 15 CIT 561, 582, 779 F. Supp. 1375, 1393

(1991); *Fundicao Tupy,* 678 F. Supp. at 902.  Thus, to the extent plaintiffs challenge the ITC's use

of fungibility in its determination of whether the subject imports compete with each other, this

Court holds the ITC's use of fungibility as a factor in determining whether the subject imports

competed with each other is reasonable and should not be disturbed.

ii.      *Like products and competition*

As previously noted, the Commission found the subject imports from Mexico and Canada

were like products but found the products did not compete, in part, because they were not

sufficiently fungible.[13]  R-CALF now uses these findings in an attempt to impugn the

Commission's non-cumulation determination.  Plaintiffs first allege the ITC's use of a different

and more rigorous standard of interchangeability[14] for its cumulation analysis than for its like

product analysis is arbitrary and warrants reversal of the ITC's determination.  Plaintiffs also

argue it was arbitrary for the Commission to give different weight to the finding of a lack of

interchangeability in the like product and cumulation analyses.

Plaintiffs' first argument fails because it overlooks the importance of context.  The

analysis of interchangeability for the purposes of cumulation may vary from that for like product.

*See R-M Indus., Inc. v. United States*, 18 CIT 219, 226 n.9, 848 F. Supp. 204, 210 n.9 (1994)

(finding analysis of substitutability may vary for purposes of like product analysis as compared

with analysis of cumulation and material injury), *cited in Acciai Speciali Terni, S.P.A. v. United*

*States*, 19 CIT 1051, 1068 (1995).  Such a situation would not necessarily render inconsistent

findings regarding interchangeability for the purposes of cumulation and like product analyses

arbitrary, capricious, or not in accordance with law.[15]

---

[13]  The Commission's finding that the subject imports were not fungible was based, in part, on the Commission's finding that the subject imports, imported at different stages of development, were not substitutes.  *See Live Cattle from Mexico* at 12.

[14]  Generally, the term "interchangeability" is used by the ITC in its "like product" analysis, *see, e.g., Torrington Co. v. United States*, 14 CIT 648, 652, 747 F. Supp. 744, 749 (1990), whereas the term "substitutability" is used by the ITC in its cumulation analysis.  For the purposes of clarity, this opinion will use the term "interchangeability" when comparing the two standards.

[15]  The ITC's determination in this case, however, is entirely consistent.  Not only did the ITC find there was limited fungibility for the purposes of the cumulation determination, but it also found the subject imports were not functionally or economically interchangeable for the purpose of the like product determination.  Specifically, under the cumulation analysis, the ITC

To the extent plaintiffs' second argument implies the ITC must always find like products compete with each other for the purposes of cumulation, the plaintiffs' argument also must fail. A finding by the ITC of a like product does not control whether the ITC finds competition between the subject imports for the purpose of cumulation. *See generally BIC Corp*., 964 F. Supp. at 398 (stating like product and cumulation are functionally different inquiries because they serve different statutory purposes). Rather, the ITC must conduct like product and cumulation analyses separately using the factors relevant to each determination. As further elaborated below, the Court finds the ITC's cumulation determination is neither arbitrary nor capricious and is otherwise in accordance with law.[16]

b. *Geographic overlap*

Plaintiffs contend the Commission misidentified the states in which the subject imports overlapped. Specifically, plaintiffs state the ITC "committed error in finding that imports of

---

found, in part, there was limited fungibility between the subject imports from Canada and Mexico because the products were imported at different stages of development and therefore were poor substitutes for each other. *See Live Cattle from Mexico* at 13. Similarly, in the like product analysis, the ITC found the subject imports were "not functionally or economically interchangeable because in each stage other than the final stage they [had] not reached their slaughter weight." *Id.* at 6.

[16] Plaintiffs additionally assert in their principal brief that the ITC's finding with respect to competition between Canadian and Mexican imports was erroneous because it rested, in part, on the ITC's conclusion that "'there appears to be no direct relationship between the prices for stocker/feeder cattle . . . and fed cattle ready for slaughter.'" (Plaintiffs' Mem. at 34 (quoting *Live Cattle from Mexico* at 24-25).) While price may be a relevant consideration in making a cumulation determination to the extent it is used to identify the market segment in a fungibility analysis, *see Granges Metallverken AB v. United States*, 716 F. Supp. 17, 22-24 (CIT 1989), price is most relevant to the ITC's material injury determination. Moreover, the conclusion which plaintiffs challenge exists in the ITC's material injury analysis. Thus, this Court analyzes plaintiffs' challenge to the ITC's conclusion regarding the relationship between prices for stocker/feeder cattle and fed cattle under the material injury section.

Mexican and Canadian cattle overlapped in Indiana rather than Idaho." (Plaintiffs' Reply at 4.)

Although plaintiffs acknowledge that the ITC admits it committed this error, plaintiffs assert the

error was not harmless as such evidence shows "Mexican cattle were present near the U.S.-

Canadian border with Canadian cattle, just as Canadian cattle were present near the U.S.-Mexican

border with Mexican cattle." (Plaintiffs' Reply at 4.)

The Court does not agree with plaintiffs' assertion that the Commission's error is not

harmless. In reaching its decision, the Court must be careful not to remand the ITC's preliminary

determination for an error of fact unless the Court is in substantial doubt regarding whether the

ITC would have reached the same conclusion were the error not to have occurred. *See, e.g.,*

*Campbell v. Merit Sys. Protection Bd.*, 27 F.3d 1560, 1570 (Fed. Cir. 1994) (citing *NLRB v. Reed*

*& Prince Mfg. Co.*, 205 F.2d 131, 139 (1st Cir. 1953)). Although the ITC erroneously identified

one of the states in which the subject imports overlapped, there is other information on the record

which supports the ITC's conclusion that there was little geographic overlap between subject

imports of live cattle from Canada and Mexico.

Specifically, according to evidence before the ITC, the majority of the imports from

Mexico went to four states (California, New Mexico, Texas, and Arizona: 96.3 percent) whereas

only 0.51 percent of the imports from Canada went to those same states. (*See* Post-Conf. Brief of

CNG at 8-9, AR Doc. No. 181, *in* Appendix of Administrative Record Documents to Accompany

Defendant-Intervenor's Brief Opposing Plaintiffs' Rule 56.2 Motion for Judgment Upon the

Agency Record (Def.-Interv.'s App.).) In the states in which there was overlap, the imports from

one country or sometimes both countries were minimal. *See* Table D-1, *Live Cattle from Mexico*

at D-3.[17] Further, as pointed out by the Commission, when corrected for the error, there appears there would have been less of an overlap between Canadian and Mexican cattle than existed when Indiana was incorrectly listed as an overlapping state.[18] (*See* Def.'s Mem. at 31-32 n.89.) Therefore, though the ITC acknowledges making a factual error, this Court finds there is not substantial doubt as to whether the ITC would have reached the same conclusion were it to have correctly identified the overlapping states. Accordingly, this Court finds that the ITC had a rational basis for concluding there was limited geographic overlap between the markets for the subject imports from Canada and Mexico.

      c.     *Channels of distribution*

Plaintiffs allege the ITC erred in concluding that "the purchasers, and thus the channels of distribution, vary depending on the stage of [development of the cattle]." *Live Cattle from Mexico* at 14. Specifically, plaintiffs state that there was evidence on the record that "*feedlots* may acquire *stocker* cattle as well as *feeder cattle* and that *packers* (i.e., the slaughterhouses) may

---

[17] According to Table D-1, the following number of Mexican and Canadian cattle were imported into the overlapping states during the period of investigation: (1) Colorado: 459,872 from Canada (9.3 percent share); 38,657 from Mexico (1.3 percent share); (2) Idaho [for the purpose of this comparison, the Court substitutes "Idaho" for "Indiana" to correct the error committed by the ITC in constructing this table; it is the Court's understanding that the ITC inaccurately identified "Indiana" on the table listing Mexican imports instead of the correct state, "Idaho"]: 230,960 from Canada (4.7 percent share); 32,344 from Mexico (1.1 percent share); (3) Kansas: 95,937 from Canada (1.9 percent share); 28,118 from Mexico (0.9 percent share); (4) Nebraska: 558,805 from Canada (11.3 percent share); 5,690 from Mexico (0.2 percent share); and (5) Texas: 13,809 from Canada (0.3 percent share); 1,398,874 from Mexico (46.5 percent share). *See Live Cattle From Mexico* at D-3.

[18] For example, a total of 230,960 cattle imported from Canada entered Idaho during the period of investigation while only 32,344 cattle imported from Mexico entered Idaho. In contrast, a total of 48,431 cattle imported from Canada entered Indiana compared with the erroneously reported 32,344 cattle imported from Mexico. *See id.*

acquire *feeder cattle* as well as *fed cattle* ready for slaughter." (Plaintiffs' Reply at 3.)

Plaintiffs' challenge merits some consideration. Evidence identified by plaintiffs does suggest some packers purchased live cattle at both the fed and feeder stages of development. Nevertheless, there is evidence on the record that the ITC was aware that a limited number of operators in one segment of the market purchased cattle at another stage of development. *See Live Cattle from Mexico* at 6-7 n.26. "'Absent some showing to the contrary, [the ITC] is presumed to have considered all evidence in the record'" in making its determination. *See, e.g., Connecticut Steel*, 852 F. Supp. at 1065 (quoting *Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 55, 592 F. Supp. 1318, 1326 (1984) (citation omitted)). Further, the Court need only find that the ITC's path was reasonable. Evidence on the record supports the ITC's conclusion. For example, plaintiffs admit that the "majority [of Canadian cattle] enter for slaughter, after being purchased by the packers or their order buyers" whereas the volume of Mexican cattle "purchased for immediate slaughter is minimal." (R-CALF Post-Conf. Brief, Responses to Questions at 22-23, AR Doc. 180, *in* Defendant U.S. International Trade Commission's Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record Appendix.) This Court finds the ITC's determination was reasonable and therefore not arbitrary and capricious or an abuse of discretion.[19]

---

[19] The Commission found, and the plaintiffs do not protest, that the imports of live cattle from Canada and Mexico were simultaneously present in the market throughout the period of the investigation. Therefore, this issue will not be addressed in this opinion.

     3.       *Cumulation of finished and unfinished products*

Another of plaintiffs' core arguments is that the ITC's determination not to cumulate the

subject imports which entered the United States at different stages of development is inconsistent

with long-standing agency practice to cumulate finished and unfinished products where both

finished products were intended for the same end use.  Plaintiffs cite in their brief and in answers

submitted in response to the Court's inquiry to several ITC determinations which plaintiffs claim

support their assertion.[20]  In particular, plaintiffs point to the preliminary investigations of

imported pipe fittings from China and Thailand where the ITC cumulated the finished and

unfinished pipe fittings even though they were "'*finished by domestic producers . . . and sold as*

*domestic product.*'"  (Plaintiffs' Mem. at 18 (quoting *Certain Carbon Steel Butt-Weld Pipe*

*Fittings from China and Thailand*, USITC Pub. 2401, at 17-18, Invs. Nos. 731-TA-520 and 521

(Prelim.) (July 1991)).)  Plaintiffs argue that since the ITC has a consistent practice of cumulating

finished and unfinished imports, the ITC must follow this practice or state it is aware that it is

changing its views and articulate permissible reasons for that change.  (Plaintiffs' Reply at 11-12

(citing *Citrosuco Paulista, S.A. v. United States*, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1088

(1988); *Atchison, Topeka & Santa Fe R.R. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808-09

---

[20]  Plaintiffs cite, in their original brief, to the following ITC determinations:  *Certain Carbon Steel Butt-Weld Pipe Fittings from China and Thailand*, USITC Pub. 2401, Invs. Nos. 731-TA-520 and 521 (Prelim.) (July 1991); *Certain Carbon Steel Butt-Weld Pipe Fittings From France, India, Israel, Malaysia, The Republic of Korea, Thailand, The United Kingdom, and Venezuela*, USITC Pub. 2767, Invs. Nos. 701-TA-360 and 361 (Prelim.);731-TA-688 through 695 (Prelim.) (April 1994); *Certain Granite from Italy and Spain*, USITC Pub. 2016, Invs. Nos. 701-TA-288 and 289 (Prelim.); 731-TA-381 and 382 (Prelim.) (Sept. 1987); *Certain Cased Pencils From The People's Republic of China and Thailand*, USITC Pub. 2713, Invs. Nos. 731-TA-669-670 (Prelim.) (Dec. 1993).  Plaintiffs cite to an additional seventeen ITC determinations in their answers submitted in response to the Court's inquiry.  (*See* Plaintiffs' Answers to Questions by the Court at 3.)

(1973)).)

The Court does not agree with plaintiffs' assertion that the ITC has a "practice" of cumulating finished and unfinished products. An action by the ITC becomes an "agency practice" when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure. *See, e.g., Heraeus-Amersil, Inc. v. United States*, 9 CIT 412, 416, 617 F. Supp. 89, 93 (1985). Upon examination of substantially all the determinations cited by the parties where the ITC has addressed the issue of cumulation of finished and unfinished products, there does not appear to be a "practice" by the ITC of cumulating subject imports where, as here, the products are imported at various stages of development.

Although many of the cases cited by the parties do cumulate finished and unfinished products, the cumulation analysis does not focus on the finished and unfinished nature of the products. Rather, the analysis focuses on the four-factor test used by the ITC in determining whether the imports compete with each other (fungibility, geographic overlap, simultaneous presence in the market, and channels of distribution). Based on these four factors, the ITC appears to make independent, case-by-case decisions regarding whether the imported products must be cumulated. Such a conclusion is consistent with past Court determinations which have required the ITC decisions to be "based upon an independent evaluation of the factors with respect to the unique economic situation of each product and industry under investigation." *Citrosuco Paulista*, 704 F. Supp. at 1087-88; *see also Alberta Pork Producers' Mktg. Bd. v. United States*, 11 CIT 563, 583, 669 F. Supp. 445, 461 (1987); *see generally Maine Potato*

*Council v. United States,* 9 CIT 293, 300 n.7, 613 F. Supp. 1237, 1244 n.7 (1985).

Moreover, the subject imports at issue here are distinguishable from subject imports where the ITC has cumulated finished and unfinished products. In the majority of cases cited by plaintiffs, the finishing process for the unfinished products is relatively minor. For example, in the pipe fitting cases, the finishing process is minimal, involving finishing steps such as shot-blasting, heat treatment, machining, etc. *See, e.g., Butt-Weld Pipe Fittings from Brazil and Taiwan*, USITC Pub. 1918, at 7 n.17, Invs. Nos. 731-TA-308 and 310 (Final) (Dec. 1986). The weighted average cost attributable to the finishing process is only about fourteen percent of the total cost of production. *See id.* at 6-7. Further, finishing does not significantly alter the function of the fitting. *See id.* at 6.

In contrast, the alleged "unfinished" merchandise at issue here undergoes a "substantial transformation" in the United States. According to Robin L. Turner, attorney for the United States International Trade Commission, of the cattle imported from Mexico, approximately "two-thirds [of the size and weight of the cattle] gets added . . . in the United States." (Oral Argument Transcript, July 28, 1999, at 60 (Arg. Tr.).) Moreover, Mexican cattle "take a year to become beef." (Arg. Tr. at 57.) The Court finds the degree of transformation and the length of time needed to transform the alleged "unfinished" imports from Mexico into "finished" products distinguishes these products from other products in cases in which the ITC has cumulated finished and unfinished imports. In adhering to the above finding, this Court does not endorse plaintiffs' contention that the ITC is bound in this case to its past actions of cumulating finished and unfinished products where, as here, cumulation is not supported by the facts in the record.

For the foregoing reasons, the Court finds the ITC's determination not to cumulate the subject imports from Mexico with those from Canada is not arbitrary or capricious, not an abuse of discretion, and is otherwise in accordance with law.

C.    *The ITC's Negative Injury Determination*

In determining whether there is a reasonable indication of material injury or threat of material injury by reason of the subject imports under investigation pursuant to 19 U.S.C. § 1673b(a), the ITC closely follows the statutory outline and focuses its attention on the volume of imports of the subject merchandise, the effects of those imports on prices in the United States for domestic like products, and the impact of those imports on domestic producers of domestic like products. *See* 19 U.S.C. § 1677(7)(B) (1994). In evaluating each of these issues, the ITC specifically considers the factors set forth in 19 U.S.C. § 1677(7)(C).[21]

_____

[21]  19 U.S.C. § 1677(7)(C) (1994) specifically states:

(C) Evaluation of relevant factors

For purposes of subparagraph (B)—

(i) Volume

In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

(ii) Price

In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—

(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the

The Court notes that Congress has vested the ITC with considerable discretion as to the weight it will assign a given factor in making its injury determination.[22] *See, e.g., Copperweld Corp. v. United States*, 12 CIT 148, 156, 682 F. Supp. 552, 564 (1988). In reviewing the ITC's

---

> United States, and
>> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.
>
> (iii) Impact on affected domestic industry
>
> In examining the impact required to be considered under subparagraph (B)(i)(III), the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to—
>> (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
>> (II) factors affecting domestic prices,
>> (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,
>> (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and
>> (V) in a proceeding under part II of this subtitle, the magnitude of the margin of dumping.
>
> The Commission shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry.

---

[22] Congress has explained that:

> The significance of the various factors affecting an industry will depend upon the facts of each particular case. Neither the presence nor the absence of any factor listed in the bill can necessarily give decisive guidance with respect to whether an industry is materially injured, and the significance to be assigned to a particular factor is for the ITC to decide.

S. REP. NO. 96-249, at 86 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 474.

determination, it is not this Court's function to decide that, were it the ITC, it would have made the same decision on the basis of the evidence. *See, e.g., Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984). This Court will not disturb the ITC determination so long as a rational basis exists for the choices made by the ITC. *See, e.g., Bowman Transp., Inc. v. United States*, 419 U.S. 281, 285 (1974).

1.       *Volume of imports*

Plaintiffs argue there are undisputed facts in the record which demonstrate that the ITC's negative preliminary injury determination failed to satisfy the "clear and convincing" standard of evidence required of the ITC, and therefore its negative injury determination is contrary to law. Specifically, plaintiffs argue the ITC failed to address the price sensitivity of the market and the impact even a "modest volume" of imported cattle can have on prices in the domestic market. Plaintiffs state this omission is in conflict with the Commission's statement concerning the effects of Canadian cattle imports on the domestic market that even "'relatively small volumes [of imports] can have significant price effects in this price-sensitive market,'" (Plaintiffs' Mem. at 45 (quoting *Live Cattle From Mexico* at 20)), and the ITC's own view from its 1997 section 332 study which found a significant correlation between changes in prices and import supplies of cattle. (Plaintiffs' Mem. at 45 (citing Cattle and Beef: Impact of the NAFTA and Uruguay Round Agreements on U.S. Trade, USITC Pub. 3048, at K-9 through K-11 (July 1997), AR Doc. 232, *in* Plaintiffs' App.).) Moreover, plaintiffs argue the ITC failed to focus on certain data which showed an increase in imports of Mexican cattle by 47.7 percent by head and 51.1 percent by weight between 1996 and 1997.

Plaintiffs' challenges lack merit. First, regarding plaintiffs' contention that the ITC failed to consider the significance the volume of Mexican cattle allegedly had on the price-sensitive domestic cattle industry, there is evidence on the record that the ITC specifically considered the volume of Mexican cattle in the context of the domestic industry. In its analysis concerning volume, the ITC concluded that "the small volume of subject imports from Mexico and their market share, *even in the context of the conditions of competition for this industry*, are not significant." *Live Cattle from Mexico* at 24 (emphasis added). Further, as discussed below, there was a rational basis for the ITC to have found that the small volume of Mexican imports did not significantly affect the domestic price. Therefore, it was reasonable for the ITC to conclude that the small volume of cattle from Mexico was not significant.

Second, regarding plaintiffs' allegation that the ITC failed to focus on data showing an increase in the imports of Mexican cattle in 1996-97, the plaintiffs' claim is equally without merit. Although there was an increase in the market share of imports from Mexico between 1996-1997, the ITC acknowledges this increase in its report. *See Live Cattle from Mexico* at IV-2. As stated previously, "'[a]bsent some showing to the contrary, [the ITC] is presumed to have considered all evidence in the record'" in making its determination. *See, e.g., Connecticut Steel*, 852 F. Supp. at 1065 (quoting *Rhone Poulenc*, 592 F. Supp. at 1326). Further, in conducting its review, the Court need only consider whether there has been a clear error of judgment on the part of the ITC. The Court will not disturb the ITC's determination so long as a rational basis exists for the choices made by the ITC. *See Bowman*, 419 U.S. at 285. Here, the ITC examined the overall trend of imports from Mexico and found, in part based on the historical data, that imports from Mexico held a small and decreasing share of the U.S. market over the period of investigation, s*ee Live*

*Cattle from Mexico* at 23-24, Table C-1, and Table IV-3[23], and were at an historical low. (*See* Post-Conf. Brief of CNG at 12-14 and Appendix 4, AR Doc. No. 181, *in* Def.-Interv.'s App.) Thus, this Court finds the ITC had a rational basis for its conclusion concerning the volume of imports from Mexico.

2.      *Price effects*

Plaintiffs argue the ITC's analysis regarding the effect of imports of Mexican cattle on domestic prices is also deficient. First, plaintiffs contend the ITC's analysis is deficient because the ITC incorrectly relied on the absence of evidence of underselling by imports from Mexico whereas it discounted the evidence regarding the presence of underselling by imports from Canada. Second, plaintiffs argue the ITC's pricing analysis was flawed because the ITC concluded that "there appears to be no direct relationship between the prices for stocker/feeder cattle . . . and fed cattle ready for slaughter," *Live Cattle from Mexico* at 24-25, despite evidence that there is a correlation between the prices of cattle at different stages of development.

In support of their latter argument, plaintiffs contend there is evidence that lower fed cattle prices depress the returns possible on the stocker cattle which have grown to slaughter-ready cattle. Also, plaintiffs cite to a report which states, "imports of live cattle from Mexico (which are

_____

[23]   Table C-1 shows that U.S. imports of live cattle from Mexico by weight were 709.3 million pounds in 1995, 196.8 million pounds in 1996, and 297.2 million pounds in 1997. Table IV-3 shows the share of quantity of cattle from Mexico decreased by weight from 1.7 percent in 1995 to 0.5 percent in 1996 to 0.7 percent in 1997 to 0.5 percent from January to October in 1997 and 1998.

mostly lightweight feeder cattle) reduced feeder prices by $1.05 per [cwt][24]" and that "eliminating 33 percent of the live cattle imports from Mexico will increase prices of fed cattle by $0.48 per [cwt] and feeder cattle by $0.79 per [cwt]." (R-CALF Post-Conf. Brief, Ex. 10, at 3, 5, AR Doc. 180, *in* Plaintiffs' App.) Further, plaintiffs point to evidence which states, "[t]he impact of unfairly traded live cattle imports from Mexico are not as immediate . . . [t]he direct price impacts are felt by cow-calf producers, whose product competes directly with Mexican live cattle. Fed cattle producers are impacted after those feeders are finished in feedlots and sent to packing houses, resulting in increased supplies of live cattle for slaughter and lower returns for U.S. fed cattle." (Transcript Dated 12/2/98 Filed by Office of Investigations, on behalf of the Commission at 41-42, AR Doc. 154, *in* Supplemental Appendix of Public Record Documents to Accompany Plaintiffs' Reply to Opposition of Defendant and Defendant-Intervenor to Plaintiffs' Motion for Judgment on the Agency Record.)

Plaintiffs additionally argue the ITC used a different time period to analyze the overall change in import volumes and the price trends concerning the imports from Mexico and that the use of different time periods in the ITC's determination is arbitrary and capricious. Plaintiffs also identify evidence that recent data showed U.S. prices for stockers declining in certain quarters between 1996 to 1998 which conflicts with the ITC's finding that U.S. stocker prices "'increased from 1996 to 1998.'" (Plaintiffs' Mem. at 47 (quoting *Live Cattle from Mexico* at 24 n.145).) Further, plaintiffs question why the ITC did not explain why an earlier finding that "'[l]arge supplies of U.S. feeder cattle coupled with increased imports of feeder cattle from Mexico during

---

[24] "Cwt" means "hundredweight."

1995 contributed to the decline in feeder cattle prices [in 1996],'" (Plaintiffs' Mem. at 48 (emphasis omitted) (quoting Cattle and Beef: Impact of the NAFTA and Uruguay Round Agreements on U.S. Trade, USITC Pub. 3048 at 2-16 (July 1997), *in* Plaintiffs' App.)), was not dispositive to the instant investigations where evidence shows Mexican imports increased 47.7 percent by head and more than 50 percent by weight from 1996 to 1997. (*See* Plaintiffs' Mem at 48.)

In support of its finding that there is no direct relationship between the pricing data for stocker/feeder cattle and fed cattle ready for immediate slaughter, the ITC cites to the staff report conclusion that "[t]here are clear price differences between slaughter cattle, feeder cattle, and yearling-stocker cattle, not only in absolute prices but sometimes also in the price trends." *Live Cattle from Mexico* at I-7. The ITC cites raw data within the staff report which demonstrates the absence of such a correlation. For example, the ITC cites to data of quarter-on-quarter comparisons of U.S.D.A. prices between 1996-97 which show increases in stocker[25] prices in every quarter (from 31 percent to 51 percent gains) while only slight increases or even decreases for slaughter prices (from 4 percent decreases to 10 percent gains). (*See* Def.'s and Def.-Intervenor's Joint Response to the Written Questions Presented by the Court at the Rule 56.2

---

[25] It appears the ITC's reference to "stocker" cattle prices here correlates with the "feeder steers" identified in the charts to which the ITC cites in support of its finding that there is no direct relationship between the prices of stocker/feeder cattle and fed cattle ready for slaughter. The charts to which the ITC cites identify the products at issue as "feeder steers 300 to 400 pounds" and "500 to 550 pounds" as well as "fed steers intended for slaughter (1,200+ pounds)" and "fed heifers for slaughter (1,100+ pounds)." *Live Cattle from Mexico* at V-7 and V-8. The lighter animals appear to correlate with the ITC's description of "stocker" cattle submitted to the Court. (*See* Def.'s and Def.-Int.'s Jt. Resp. to the Court, Tab 2, para. 1 (stating stockers generally weigh between 400 pounds and 650 to 750 pounds).)

Hearing and Joint Comments on the Court's "Schedule of Plaintiffs' Alleged Factual Errors by the ITC," Tab 2, para. 3 (citing *Live Cattle from Mexico* at Tables V-1 and V-2).)  Further, the ITC cites to a response to staff questions which states, "there are separate markets—even separate futures markets—and separate prices for stockers and slaughter cattle."  (Post-Conf. Brief of CNG, App. 1, at 3, AR Doc. 181, *in* Def.-Interv.'s App.)

The ITC additionally explains, in contrast to plaintiffs' assertions, that the Commission considered all pricing data for the entire period of investigation and not only for the 1996-1998 period.  The ITC additionally argues "the Commission's 1997 [section] 332 study which found that feeder cattle prices decreased in 1996 . . . was not an antidumping investigation and the information and data gathered in that investigation were not for the same time period considered by the Commission here."  (Def.'s Mem. at 41-42 n.128.)

After considering the evidence and the arguments of the parties, the Court finds the Commission's conclusion concerning the effect of imports from Mexico on domestic prices of live cattle is reasonable, not arbitrary or capricious, and not an abuse of discretion.  First, concerning plaintiffs' contention that the Commission incorrectly relied on the absence of evidence of underselling by imports from Mexico whereas it discounted the evidence regarding the presence of underselling by imports from Canada, the Court finds plaintiffs' concern is without merit.  "The Commission has discretion to ascertain which economic factors are relevant in an investigation, and the weight to be given those factors."  *Torrington*, 790 F. Supp. at 1170 (citations omitted).  In this case, the Commission found there was no evidence of underselling by imports from Mexico.  The Commission also found, however, that the volume of imports from

Mexico and market share were too small to affect domestic prices to a significant degree. The combination and interaction of these variables concerning subject imports from Mexico could lead the ITC reasonably to conclude that lack of underselling was a significant factor in this investigation. Although the reason for considering the absence of underselling a significant factor in its determination was not explicitly given, the path of the Commission's decision is discernible. *See Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987). Thus, this Court finds the ITC did not abuse its discretion in considering the absence of underselling by Mexican imports in its price determination.

Second, concerning the Commission's finding of no direct link between the prices of stocker/feeder cattle and fed cattle, the Court finds there is information on the record which supports the ITC's conclusion. For example, the ITC points to evidence indicating increases in stocker prices for each quarter between 1996 to 1997 while prices for slaughter cattle for the same period increased only slightly or even decreased. Further, the ITC cites evidence which states there are separate markets, even futures markets, between stocker cattle and slaughter cattle. Although such data is subject to interpretation, this Court cannot substitute its judgment for that of the ITC. *See Bowman*, 419 U.S. at 285. If the agency meets the requirement of articulating a "'rational connection between the facts found and the choice made,'" *id.* at 285 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)), the Court must sustain the decision. As this Court finds the ITC's finding of no direct link between stocker/feeder cattle and slaughter cattle prices may be reasonably discerned, the Court finds the ITC's determination was not arbitrary or capricious.

Plaintiffs' additional contentions are similarly not compelling. Concerning the allegation that the ITC focused on different time periods with respect to import volumes and domestic prices, it is clear from the record that the ITC had before it evidence regarding both the volume and price information for the relevant period of investigation. (*See Live Cattle from Mexico*, at IV-2 (volume) and Tables V-1 and V-2 (price)). "'Absent some showing to the contrary, the Commission is presumed to have considered all evidence in the record.'" *Connecticut Steel*, 852 F. Supp. at 1065 (quoting *Rhone Poulenc*, 592 F. Supp. at 1326 (citations omitted)). Further, the fact that the ITC chose not to focus on certain data in its main report does not indicate that the ITC failed to consider that information as "there is no statutory requirement that the Commission respond to each piece of evidence presented by the parties." *Granges Metallverken*, 716 F. Supp. at 24. Rather, such a finding merely indicates the ITC decided not to focus on such data in its main report.

Concerning plaintiffs' claim that the ITC abused its discretion in failing to follow or to explain its departure from previous findings that "'U.S. feeder cattle coupled with increased imports of feeder cattle from Mexico during 1995 contributed to the decline in feeder cattle prices [in 1996],'" (Pl.'s Mem. at 48 (emphasis omitted) (quoting Cattle and Beef: Impact of the NAFTA and Uruguay Round Agreements on U.S. Trade, USITC Pub. 3048 (July 1997), at 2-16, AR Doc. 232, *in* Plaintiffs' App.)), in a separate publication, this Court finds the ITC did not abuse its discretion. This Court has recognized that "'each injury investigation is *sui generis*, involving a unique combination and interaction of many economic variables; and consequently, a particular circumstance in a prior investigation cannot be regarded by the Commission as dispositive of the determination in a later investigation.'" *Citrosuco Paulista*, 704 F. Supp. at

1087-88 (quoting *Armstrong Bros. Tool Co. v. United States*, 84 Cust. Ct. 102, 115, 489 F. Supp. 269, 279 (1980)). As the ITC explained that the previous publication was not for an antidumping investigation and the information and data gathered were not for the same time period as this investigation, the Court finds the ITC did not abuse its discretion in apparently not relying on its previous finding in this determination.


       3.       *Impact of subject imports on domestic industry*

Plaintiffs also challenge the ITC's conclusion that subject imports from Mexico had no significant adverse impact on the domestic industry. Plaintiffs specifically state that they provided evidence to the ITC that "revenue effects from reductions in Mexican imports for [the cattle] industry would have ranged between $198.7 million and $596 million in 1997 alone (based solely on the impact on prices for fed cattle)." (Plaintiffs' Mem. at 48 (citing Post-Conf. Brief by Plaintiffs, Exhibit 10, AR Doc. 180, *in* Plaintiffs' App.).) Plaintiffs point to other evidence which showed "for each 100,000 head of feeder cattle there was a price drop of 0.555 percent, meaning the 668,000 head of cattle imported from Mexico in 1997 caused a 3.7 percent decline in U.S. feeder prices." (Plaintiffs' Mem. at 48 (footnote omitted) (citing Post-Conf. Brief by Plaintiffs, Exhibit 13, at 4, AR Doc. 180, *in* Plaintiffs' App.).) Moreover, plaintiffs argue, the ITC simply attributed the industry's weak performance in its analysis of Mexican imports to "'the liquidation phase of the cattle cycle,'" (Plaintiffs' Mem. at 49 (quoting *Live Cattle from Mexico* at 26)), overlooking evidence showing losses were the second highest in the Western region of the United States, "where most of the imports of Mexican cattle entered the United States," (Plaintiffs' Mem. at 49 (emphasis omitted) (citing *Live Cattle from Mexico* at VI-7)), despite having found imports from Canada, where the domestic industry's share of live cattle was the same as under the

investigation concerning Mexican cattle, exacerbated the normal cyclical downturn.

Plaintiffs again do not argue successfully their claim of error regarding the ITC's consideration of the impact of imports from Mexico on the domestic industry. First, regarding the apparent failure of the ITC to rely on the plaintiffs' models concerning the effects of Mexican imports on the U.S. cattle industry in terms of revenue and prices, it appears such evidence was before the Commission[26], but the ITC chose not to focus on such evidence. Rather, it appears the ITC focused on contrary evidence which showed prices of stocker cattle actually increased from 1996 to 1997.[27] In reviewing this evidence, this Court cannot substitute its judgment for that of the Commission. Rather, its role in reviewing a decision by the ITC is to ascertain whether there was a rational basis for the determination. *See, e.g., Torrington*, 790 F. Supp. at 1167 (citing *American Lamb*, 785 F.2d at 1004). Here, the ITC pointed to evidence on the record which supports its conclusion that the stocker prices for U.S. cattle increased between 1996 to 1997. This evidence appears to be actual evidence rather than estimated evidence cited to by the plaintiffs. Thus, the Court finds it was rational for the ITC to rely on evidence in the record, and

---

[26] Plaintiffs state in their principal brief that they "presented evidence" about the revenue effects and price effects from Mexican imports of live cattle to the Commission, (*see* Plaintiffs' Mem. at 48), and such evidence appears to have been part of the record. (*See* plaintiffs' cited support for its contentions at Post-Conf. Brief by Plaintiffs, AR Doc. 180, Exhibits 10 and 13, *in* Appendix of Public Record Documents to Accompany Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record (Plaintiffs' App.).)

[27] This evidence appears to conflict with plaintiffs' studies showing "for each 100,000 head of feeder cattle [imported from Mexico] there was a price drop of 0.555 percent." (Plaintiffs' Mem. at 48 (citing Post-Conf. Brief by Plaintiffs, AR Doc. 180, Exhibits 13, at 4, *in* Plaintiffs' App.).) Reference in this report to "feeder" cattle, apparently concerning 400 to 500 pound steer (*see* Post-Conf. Brief by Plaintiffs, AR Doc. 180, Exhibit 13, at 3, *in* Plaintiffs' App.), appears to correspond to the definition of "stocker" cattle as identified in this opinion and substantially agreed to by the parties. *See supra* note 2.

the ITC did not abuse its discretion nor was it arbitrary or capricious in apparently not relying on the evidence presented by the plaintiffs in making its determination.

Second, regarding the effect of the share of Mexican cattle on the U.S. live cattle industry, while plaintiffs are correct that the domestic industry's share was the same, 95 percent, for the affirmative determination regarding Canadian cattle as it was for the negative determination regarding Mexican cattle, plaintiffs do not point to evidence which shows the ITC's determination regarding Mexican cattle was erroneous or not rational. The share of the U.S. live cattle market of imports from Mexico and Canada were different. For example, the Canadian share of domestic industry remained around 3-4 percent for the period of review.[28] *See Live Cattle from Mexico* at Table C-1. The share for Mexican cattle, however, decreased from 1.7 percent to 0.5 percent during the same period. *See id.* at 23 and Table C-1. Though the difference is small, the ITC concluded the difference was sufficient to have differing impacts on the domestic industry. As there appears to be a rational basis for the ITC's determination and as the plaintiffs have not identified evidence to the contrary, plaintiffs have not proven the ITC's determination regarding Mexican cattle was erroneous or not rational.

D.      *Likelihood of Finding Contrary Evidence in Final Investigation*

Finally, plaintiffs argue the Commission should have issued an affirmative preliminary determination in this case in order to collect further information in a final investigation. The ITC,

---

[28] 3.4 percent in 1995; 4.2 percent in 1996; 3.8 percent in 1997; 4.0 percent in January to October 1997; and 4.0 percent in January to October 1998. *See Live Cattle from Mexico* at Table C-1.

when making its determination, however, must decide whether there is a reasonable indication for finding "no likelihood exists that *contrary* evidence will arise in a final investigation." *American Lamb*, 785 F.2d at 1001 (emphasis added). The Commission is not required to determine whether there is a reasonable indication *additional* information may be collected. Given that the ITC weighed the evidence in the record and that its negative determination was based upon comprehensive and complete information using official U.S. Department of Agriculture data, official import statistics, and responses on the domestic industry, the validity of which the plaintiffs do not challenge, the Court finds there was a rational basis for the Commission's conclusion that no likelihood exists that contrary evidence will arise in a final investigation.

CONCLUSION

After considering all of the plaintiffs' arguments and for the reasons stated above, the Court holds the ITC's negative preliminary injury determination concerning live cattle from Mexico was not arbitrary or capricious, not an abuse of discretion, and was otherwise in accordance with law. Therefore, the Court denies plaintiffs' motion and sustains the ITC's negative preliminary injury determination concerning live cattle from Mexico in *Live Cattle from Canada and Mexico*, 64 Fed. Reg. 3716 (Jan. 25, 1999). This action is dismissed.

_____
Gregory W. Carman, Chief Judge

Dated: November 5, 1999
New York, New York