Slip Op. 06-11

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                               :
INTERNATIONAL IMAGING           :
MATERIALS, INC.                 :
                               :
        Plaintiff,              :
                               :
            v.                  :   Before: Richard K. Eaton, Judge
                               :
                               :   Court No. 04-00215
UNITED STATES INTERNATIONAL     :   Public Version
TRADE COMMISSION,               :
                               :
                               :
        Defendant.              :
                               :
_____:
```

OPINION AND ORDER

[United States International Trade Commission's final negative determination on wax and wax/resin thermal transfer ribbons remanded]

Dated: January 23, 2006

*Steptoe & Johnson, LLP* (*Richard O. Cunningham*, *Tina Potuto Kimble*, and *Thomas J. Trendl*), for plaintiff.

*James M. Lyons*, General Counsel, United States International Trade Commission; *Neal J. Reynolds*, Acting Assistant General Counsel, United States International Trade Commission (*Andrea C. Casson*), for defendant.

*Wiley Rein & Fielding LLP* (*Alan H. Price* and *Daniel B. Pickard*), for defendant-intervenors Armor U.S.A. and Armor, S.A.

*Paul, Hastings, Janofsky & Walker LLP* (*Hamilton Loeb* and *Alexander W. Koff*), for defendant-intervenors DNP IMS America Corp. and Dai Nippon Printing Co., Ltd.

Eaton, Judge:  This matter is before the court following the motion of plaintiff International Imaging Materials, Inc. ("IIMAK") for judgment upon the agency record pursuant to USCIT Rule 56.2.  By its motion, IIMAK contests the final negative determinations of the U.S. International Trade Commission ("ITC" or "Commission") in the antidumping duty investigations concerning certain wax and wax/resin thermal transfer ribbons ("TTR") from France and Japan.  *See* Certain Wax and Wax/Resin Thermal Transfer Ribbons From France and Japan Determinations, 69 Fed. Reg. 20,949  (Apr. 19, 2004) ("Final Determination").  In its Final Determination, the ITC found that the domestic industry was not injured or threatened with injury by reason of subject imports.

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000).  For the reasons set forth below, this matter is remanded to the ITC for action in accordance with this opinion.

BACKGROUND

TTRs are ink-covered strips of film used in barcode printers and fax machines.  *See* Certain Wax and Wax/Resin Thermal Transfer Ribbons from France and Japan, Inv. Nos. 731-TA-1039-1040 (Final), Confidential Views of the Commission (April 2004), Conf.

R. Doc. 314 ("ITC Views").  The first two steps in producing TTR, ink-making and coating, are done exclusively by "coaters" that possess the machinery and equipment necessary to perform that work.  *Id.* at 3.  These steps yield "jumbo rolls."  The jumbo rolls are put through two additional production steps, slitting and packaging, by "slitters" before being sold on the open market.  *Id.*  The additionally-processed product produced by the slitters is known as finished TTR.  *Id.* at 3 n.5.  Finished TTR falls into two categories: fax TTR, also known as "finished fax TTR" or "slit-fax TTR" and non-fax TTR, also known as "barcode TTR."  There are few U.S. sales of imported jumbo rolls because wholly-owned subsidiaries of foreign-based coaters (i.e., U.S.-based slitters) largely consume the rolls themselves to produce finished fax TTR and barcode TTR.  *Id.* at 30.[1]

### STANDARD OF REVIEW

The court will hold unlawful "any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(I).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate

---

[1]     The ITC "refer[s] to TTR that is slit and packaged as 'finished TTR' but note[s] that parties often used the terms 'slit' or 'slitted' synonymously with 'finished.'" ITC Views at 3 n.5.

to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citations omitted).  It "requires 'more than a mere scintilla,' but is satisfied by 'something less than the weight of the evidence.'" *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)). The existence of substantial evidence is determined "by considering the record as a whole, including evidence that . . . 'fairly detracts from the substantiality of the evidence.'" *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Atl. Sugar*, 744 F.2d at 1562).  In conducting its review, the court's function is not to reweigh the evidence but rather to ascertain "whether there was evidence which could reasonably lead to the Commission's conclusion . . . ." *Matsushita*, 750 F.2d at 933.  The possibility of drawing two inconsistent conclusions from the record evidence does not, in itself, prevent the ITC's determinations from being supported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted); *Altx*, 370 F.3d at 1116.

DISCUSSION

Plaintiff makes two primary arguments as to why the ITC's Final Determination is flawed.  First it claims that the Commission erred in its definition of the domestic like product and second, that in its volume and price effects analysis, the ITC should have looked beyond the limited competition for jumbo rolls to downstream competition for finished TTR.

I.    Domestic Like Product — The ITC's Use of Its Six-Factor Analysis

In order to determine whether a domestic industry is materially injured or threatened with material injury, the ITC must define the domestic like product.  *See* 19 U.S.C. § 1677(10).  While Commerce determines the scope of its less than fair value investigation, the ITC is responsible for identifying "the corresponding universe of items produced in the United States that are like[,] or in the absence of like, most similar in characteristics and uses with the items in the scope of the investigation."  Def.'s Mem. in Opp'n to Pl.'s Mot. J. Agency R. ("Def.'s Mem.") at 15; *see also* 19 U.S.C. § 1677(10).  After the ITC has determined what constitutes the domestic like product, it must next examine "the volume of imports, their effect on prices for the domestic like product, and their impact on domestic producers of the domestic like product . . . ."  ITC Views at 27; *see also* 19 U.S.C. § 1677(7)(B)(i)(I)-(III).  All of these

factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."  19 U.S.C. § 1677(7)(C)(iii).

The ITC defines domestic like product by determining whether there are "clear dividing lines" between any of the domestically-produced items that would warrant finding more than one item to be part of the definition or excluding an item from the definition.  *NEC Corp. v. Dep't of Commerce*, 22 CIT 1108, 1110, 36 F. Supp. 2d 380, 383 (1998).  That is, if the ITC concludes that there are no clear dividing lines between any of the domestically produced items, it then includes them as part of the domestic like product.  "The Commission's decision regarding the appropriate domestic like product is a factual determination, where the Commission applies the statutory standard of 'like' or 'most similar in characteristics and uses' on a case-by-case basis."  *Id*.  The ITC's findings with respect to domestic like product may, but need not, match the scope of the investigation. *See Hosiden Corp. v. Advanced Display Mfrs.*, 85 F.3d 1561, 1568 (Fed. Cir. 1996) (explaining that the ITC has the discretion to determine to what extent the class or kind of merchandise described by Commerce falls within the scope).

In the Final Determination, the ITC used its previously employed six-factor analysis,[2] which compares (1) physical characteristics and uses; (2) interchangeability; (3) channels of distribution; (4) customer and producer perceptions; (5) manufacturing facilities, production processes, and production employees; and (6) price of the domestic products to the subject imports. *See* ITC Views at 8. Using this analysis, the Commission concluded that finished fax TTR was part of the domestic like product. *See id*. at 8-14.

Plaintiff questions the use of the six-factor test, insisting that the ITC erred in not applying a semifinished product analysis, which seeks to determine "whether articles at different stages of processing should be included in the same like product."[3] Br. of IIMAK in Supp. of R. 56.2 Mot. J. Agency R. ("Pl.'s Br.") at 30. As IIMAK explains in its brief:

> Under this [semifinished product] analysis, the ITC examines (1) whether the upstream article is dedicated to the production of the downstream article or has

---

[2] *See, e.g.*, *Acciai Speciali Terni S.p.A. v. United States*, 24 CIT 1064, 1065 and n.4, 118 F. Supp. 2d 1298, 1300 and n.4 (2000)(upholding the ITC's use of its six-factor test); *NMB Singapore Ltd. v. United States*, 27 CIT __, __, 288 F. Supp. 2d 1306, 1326 (2003)(sustaining the ITC's use of the six-factor analysis).

[3] As with the six-factor analysis, the ITC has used the semifinished product analysis in the past. *See, e.g.*, Stainless Steel Bar from Brazil, India, Japan, and Spain, Inv. No. 731-TA-678, 679, 681, and 682 (Final), USITC Pub. No. 2856 (1995).

independent uses; (2) whether there are perceived to be separate markets for the upstream and downstream articles; (3) differences in the physical characteristics and functions of the upstream and downstream articles; (4) differences in the costs or value of the vertically differentiated articles; and (5) the significance and extent of the processes used to transform the upstream into the downstream articles.

Pl.'s Br. at 31 n.32. Thus, using IIMAK's preferred methodology, the upstream product jumbo rolls would be compared to the downstream products barcode TTR and finished fax TTR. IIMAK explains:

> Applying the semifinished product analysis in this case would have [led] to the conclusion that [finished] fax TTR is not part of the same like product as certain TTR.[4] Jumbo rolls are not dedicated to the production of [finished] fax TTR. . . . [T]here are separate markets for jumbo and [finished] fax TTR. There are also differences in physical characteristics and functions of jumbo rolls (which are large rolls designed to be slit) and [finished] fax TTR (which are used as a component part in fax machines and come in more advanced packaging). While jumbo rolls are completely fungible products with little or no distinguishing features between products of the same type, [finished] fax TTR is a tailor-made product. The

---

[4]    IIMAK notes that finished fax TTR was specifically excluded from Commerce's scope determination.

> The scope includes jumbo rolls of wax TTR that are used in facsimile and multifunction thermal transfer printing devices . . . jumbo rolls of wax/resin TTR that are used in bar code printing devices . . . and rolls of bar code TTR that have been slit and finished for use in specific printing devices ("finished TTR"). The scope, however, excludes rolls of fax TTR that have been slit and finished for use in other specific printing devices ("finished fax TTR").

ITC Views at 7 (footnote omitted) (internal citation omitted).

> functions of TTR in jumbo roll form and [finished] fax
> TTR are also different.  Jumbo TTR rolls have no
> purpose other than slitting.  They are, however,
> primarily slit into subject barcode TTR. [Finished] fax
> TTR is inserted into fax machines in which it is used
> for thermal transfer printing.

Pl.'s Br. at 31–32 (internal citations omitted). IIMAK asserts

that it is entitled to the use of the semifinished product

analysis based on its utilization in previous cases, in

particular Chlorinated Isocyanurates From China and Spain, Inv.

Nos. 731-TA-1082-1083 (Prelim.), USITC Pub. No. 3705 (2004).[5]

Plaintiff contends that the ITC, having previously used the

semifinished product analysis, is bound to continue to use it in

this case.  "The ITC must pick a methodology to apply to certain

factual circumstances and only depart from it when it provides a

reasoned justification for doing so."  Pl.'s Br. at 31.

        The ITC maintains that "IIMAK's discussion of ITC factual

determinations as though they were precedential is wrong as a

matter of law."  Def.'s Mem. at 11.  In making this claim, the

Commission relies on *Ranchers-Cattlemen Action Legal Found. v.*

*United States*, 23 CIT 861, 74 F. Supp. 2d 1353 (1999), in which

---

[5]      In that case, the scope included all chemical and
physical forms of chlorinated isocyanurates ("isos"), and the ITC
concluded that multiple forms of isos were the same like product.
Nonetheless, the ITC used the semifinished product analysis to
determine whether two different physical forms of isos, granular
and tableted, were also part of the like product.  IIMAK argues
that this decision "stands in direct contradiction of the ITC's
position in the instant case."  Pl.'s Br. at 31.

the Court explained that "[a]n action by the ITC becomes an 'agency practice' when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure." *Id*. at 884-85, 74 F. Supp. 2d at 1374. According to the Commission, ITC decisions must be "'based upon an independent evaluation of the factors with respect to the unique economic situation of each product and industry under investigation.'" *Id*. at 885, 74 F. Supp. 2d at 1374 (quoting *Citrosuco Paulista, S.A. v. United States*, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1087-88 (1988)); *see also Nucor Corp. v. United States*, 28 CIT __, __, 318 F. Supp. 2d 1207, 1247 (2004) (noting that each investigation involves a "'unique combination and interaction of many economic variables . . . .'") (quoting *Ranchers-Cattlemen*, 23 CIT at 891, 74 F. Supp. 2d at 1379). The Commission further contends that IIMAK has not shown that it deviated from an established practice or procedure, since it applied its six-factor analysis, which it had previously employed on a number of occasions. *See* Def.'s Mem. at 11.

The court agrees that the ITC's prior factual determinations cited by IIMAK do not constitute precedent that the Commission is bound to follow. First, as with all investigations, the present fact pattern is not precisely the

same as any with which the ITC has been presented. As such*,* while some of the facts may have appeared in other investigations, the totality of the facts is unique. *See, e.g., Committee for Fair Beam Imports v. United States*, 27 CIT __, __, slip op. 03-73 at 25 (June 27, 2003) (not reported in the Federal Supplement), *aff'd*, 95 Fed. Appx. 347 (Fed. Cir. 2004) ("[T]he fact that similar patterns are observed in different investigations with regard to some of the variables does not preclude a different interpretation of the patterns after viewing the entire economic environment as a whole."); *see also Citrosuco*, 12 CIT at 1209, 704 F. Supp. at 1087 ("[E]ach injury investigation is *sui generis*, involving a unique combination and interaction of many economic variables; and consequently, a particular circumstance in a prior investigation cannot be regarded by the Commission as dispositive of the determination in a later investigation.") (internal quotation omitted). Nor does the court find that the ITC had established an "agency practice" from which it deviated in this case. As is noted in *Ranchers-Cattlemen*, an agency practice is established when a uniform procedure exists that would lead a party to reasonably expect that the agency would adhere to the procedure. *Id*. at 884-85, 74 F. Supp. 2d at 1374. Here, an examination of the prior investigations cited by both parties reveals that the ITC has chosen the six-factor test in some instances and the semifinished

product analysis in others with not wholly dissimilar fact

patterns.[6]  Thus, IIMAK cannot claim any reasonable expectation

that its preferred methodology would be used.

Nonetheless, the ITC's decision to use the six-factor

analysis has not been sufficiently explained to justify its

utilization in this case. Here, the ITC does nothing more than

state its conclusion that "it found the traditional six-factor

test to be the more useful to address the issue of whether to

include finished fax TTR in the domestic like product because the

scope included products that are at the same level of processing

as the finished fax TTR." Def.'s Mem. at 26.  The Commission

further claims that because "[t]he aim of both the traditional

six-factor test and the semifinished product analysis is the same

– to ascertain whether there is a clear dividing line between

products," *id*. at 25, it has the discretion to determine, based

---

[6]     For example, the ITC applied its six-factor test in
Certain Stainless Steel Plate From Belgium, Canada, Italy, Korea,
South Africa, and Taiwan, Invs. Nos. 701-TA-376, 377, and 379
(Final) and Invs. Nos. 731-TA-788-793 (Final), USITC Pub. No.
3188 (1999) and in Certain Bearings From China, France, Germany,
Hungary, Italy, Japan, Romania, Singapore, Sweden, and the United
Kingdom, Inv. Nos. AA1921-143, 731-TA-341, 731-TA-343-345, 731-
TA-391-397, and 731-TA-399 (Rev.), USITC Pub. No. 3309 (2000).
However, the ITC used the semifinished product analysis in
Stainless Steel Bar From Brazil, India, Japan, and Spain, Inv.
No. 731-TA-678, 679, 681, and 682 (Final), USITC Pub. No. 2856
(1995) and in Chlorinated Isocyanurates From China and Spain,
Inv. No. 731-TA-1082 and 1083 (Prelim.), USITC Pub. No. 3705
(2004).

on the particular facts of the investigation, which test is the appropriate one to apply.

Although the ITC is permitted to make varying determinations based on the facts of each case, it may not act arbitrarily. Rather, the ITC must present a "reviewable, reasoned basis" for its determinations. *Bando Chem. Indus., Ltd. v. United States*, 17 CIT 798, 799 (1993) (not reported in the Federal Supplement). "[An] agency must explain its rationale . . . such that a court may follow and review its line of analysis, its reasonable assumptions, and other relevant considerations." *Allegheny Ludlum Corp. v. United States*, 29 CIT __, __, 358 F. Supp. 2d 1334, 1344 (2005). "Explanation is necessary . . . for this court to perform its statutory review function." *Dastech Int'l, Inc. v. United States*, 21 CIT 469, 475, 963 F. Supp. 1220, 1226 (1997); *see also Asociacion Colombiana de Exportadores de Flores v. United States*, 12 CIT 1174, 1177, 704 F. Supp. 1068, 1071 (1988) ("[R]easons for the choices made among various potentially acceptable alternatives usually need to be explained."). On remand, therefore, the ITC is directed to explain why it is justified in using its six-factor analysis in defining the domestic like product in this case. In doing so, the ITC shall explicitly address why the semifinished product analysis urged by plaintiff is not appropriate here.

II.  Volume and Price Effects of Subject Imports[7]

IIMAK next disputes the methodology the ITC used to measure the volume and price effects of the subject imports.[8]  In its volume analysis, the ITC measured only imports of jumbo rolls. IIMAK asserts that the proper analysis would have counted as imports the finished TTR produced in the United States from the imported jumbo rolls.  Specifically, plaintiff argues that "there can be no dispute" that the jumbo rolls are used merely for transformation into finished TTR (either finished barcode or finished fax TTR) by a U.S. company related to the importer (and thus excluded from the U.S. industry), so that it can be sold to an unrelated customer in the market for finished TTR.  Pl.'s Br. at 9.  Thus, "the only meaningful way to measure volume factors and price effects of imports on the U.S. industry is based on the volume and prices of the *finished* TTR into which the imported

---

[7]     While it might be assumed that a discussion of this issue could reasonably await the court's findings concerning domestic like product, since both parties agree that the domestic like product contains both jumbo rolls and at least one downstream product, a discussion of plaintiff's claims relating to volume is proper here.

[8]     In making its injury determination, the Commission shall consider "(I) the volume of imports of the subject merchandise, (II) the effect of imports of that merchandise on prices in the United States for domestic like product, and (III) the impact of imports of such merchandise on domestic producers of domestic like products . . . ."  19 U.S.C. § 1677(7)(B).

product is made." *Id.* at 9 (emphasis added).[9] IIMAK states that

by only looking at the volume and price effects of imported jumbo

rolls, the ITC fails to take into account that "competition for

TTR sales almost exclusively occurs at the further processed

level . . . . There is simply no way to measure the effects on

the U.S. market of subject imports dedicated to a downstream

product if the ITC does not measure the effects at the downstream

level." *Id.*

In its ITC Views, the Commission disputes IIMAK's claim that

it should measure shipments and market share of subject imports

using the downstream product. The ITC explains, "[O]ur finding

that the activities of domestic [slitters] are domestic

production means that their shipments are domestic shipments."

ITC Views at 32-33. In other words, the ITC relies on its

finding that the work performed by the domestic slitters rendered

them domestic producers and, thus, necessarily excluded their

products from being part of subject imports. This being the

case, according to the Commission, the only remaining imported

product that could be used to measure volume and price effects

---

[9]    IIMAK explains its proposed methodology as "measur[ing]
imports' effects based on the first point in the distribution
chain at which they entered the U.S. market on an arm's length
basis. This includes U.S. merchant market sales of both subject
imported jumbo rolls and [finished] TTR made from imported
subject jumbo rolls." Pl.'s Br. at 10 n.8.

was the jumbo rolls.

The ITC used its production-related activities test to reach its conclusion that the slitters produce a domestic product.  *Id*. The Commission explains:

> First, testimonial evidence by several [slitters] indicated that the initial capital investment necessary to compete effectively in the U.S. market was significant, and included investment in multiple machines necessary to produce the sizes and quantities required by large purchasers.  IIMAK's own witness agreed that slitting machines are costly. . . .  As to technical expertise involved in U.S. production activities, the ITC found, based on testimony and other evidence presented by [slitters] ITW and Armor, that the level of expertise required for slitting operations is not insignificant.  Based on [slitters'] questionnaire responses, the ITC also found that the percentage of value added by slitting and packaging operations (an average of 30 percent of the total cost of the end product) is significant.  With respect to employment levels, the ITC noted that all parties, including IIMAK, agreed that slitting and packaging operations are labor intensive, and require employment of a substantial number of employees.

Def.'s Mem. at 27–28 (internal citations omitted); *see also* ITC Views at 15-19 (analyzing the six factors related to production activities that the ITC considers in deciding whether a firm qualifies as a domestic producer).

IIMAK maintains, however, that "[e]ven assuming the Commission correctly found that the converted products undergo

substantial processing in the United States,[10] these products still are created for the sole benefit of the foreign respondents and are still within the scope."  Pl.'s Br. at 11-12.

The ITC enjoys broad discretion to choose a methodology for measuring volume.  *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-05, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987) ("As long as the agency's methodology and procedures are a reasonable means of effectuating the statutory purpose . . . the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology.").  Here, the court agrees with the ITC's finding that the U.S.-based slitters engaged in sufficient production-related activities in transforming the jumbo rolls into finished TTR to constitute domestic production.  *See USEC Inc. v. United States*, 27 CIT __, __, 259 F. Supp. 2d 1310, 1327 (2003) (noting that the production-related activities test focuses on whether "the overall nature of production-related activities in the United States . . . are sufficient for a company to be considered a member of the domestic industry.") (internal quotation omitted).  In its ITC Views, the Commission fully lays out its methodology and the facts it relied on in

_____

[10]    It is worth noting that IIMAK did not appeal this finding.

reaching its conclusions. *See* ITC Views at 16 ("[T]he value added by converting operations to the end-product, the number and technical expertise of workers employed by slitters, and their significant capital expenditures all indicate that these companies do not merely engage in low-level processing as petitioner alleges."). That being the case, the court finds that the ITC was justified in excluding finished TTR from its volume and price analysis. As a result, the sole remaining product that could constitute subject merchandise was the jumbo rolls. Thus, the court affirms the Commission's use of jumbo rolls for the purpose of measuring volume and price effects.

III. Substantial Evidence — Indirect Effects

In arguing that the ITC did not support its conclusions with substantial evidence, IIMAK first claims that it did not consider the indirect effects of the subject imports on the domestic industry. IIMAK insists that "[t]he ITC has [previously] determined that a finding of injurious price effects is not limited to instances where there is head-to-head price competition." Pl.'s Br. at 18. Plaintiff provides several examples in its brief:

> [I]n Canned Pineapple Fruit from Thailand, Inv. No.
> 731-TA-706 (Review), USITC Pub. 3417 at 12 (May 2001),
> the ITC held that prices in one product segment
> affected prices in another. Similarly, in Low Enriched
> Uranium from France, Germany, the Netherlands, and the
> United Kingdom, Inv. Nos. 701-TA-409-412 and 731-TA-909

> (Final), USITC Pub. 3486 at 11 (February 2002), the ITC
> found that a small amount of product sold in a
> commodity spot market has effects on prices of products
> sold under contract.  This Court likewise has held that
> "{s}ection 1677(7)(C)(ii) permits a finding of injury
> where an imported product . . . may not be directly
> substitutable but nonetheless causes price depression
> or suppression for the lower cost domestic product."
> R-M Indus., Inc. v. United States, 848 F. Supp. 204,
> 211 (CIT 1994).

*Id*. at 18 n.18(footnote omitted).  That is, IIMAK claims that the

Commission failed to take into account evidence that slitters

using imported jumbo rolls gained an advantage due to the lower

cost of these rolls.  In response, the ITC states that it "took

into account . . . that some U.S. production of finished TTR

started with jumbo rolls of imported TTR."  Def.'s Mem. at 37.

The ITC explains:

> Contrary to IIMAK's assertion, the ITC did not ignore
> IIMAK's argument that [slitters] were driving prices
> down because they indirectly benefitted from their
> importation of subject jumbo rolls.  The ITC examined
> this allegation and found that the evidence suggested
> otherwise.  IIMAK overlooks the ITC's statement that
> the lack of underselling shown in the limited pricing
> data was corroborated by the average unit value (AUVs)
> for jumbo rolls.  The AUV data show that, for each year
> of the [period of investigation], subject import unit
> values of jumbo rolls imported by the [slitters] were
> higher than the unit values of shipments of domestic
> jumbo rolls.  In addition, the ITC observed that the
> financial performance of the [slitters] that were most
> dependent on imported jumbo rolls (i.e., the four
> related party [slitters]) was no better than that of
> the integrated producers.  In light of these facts, the
> ITC reasonably found that importation of jumbo rolls
> did not confer a competitive advantage to [slitters]
> over the rest of the industry.

*Id*. at 34-35 (internal citations omitted)(footnote omitted).

Thus, the ITC states that

> With respect to IIMAK's arguments concerning "indirect
> effects" the ITC took into account . . . that some U.S.
> production of finished TTR started with jumbo rolls of
> imported TTR.  The ITC did not "ignore" the conditions
> of competition emphasized by IIMAK. . . .  As discussed
> above, the ITC considered IIMAK's argument that the
> [slitters] indirectly benefitted from the imports.  The
> ITC found that this premise was not supported by the
> record evidence concerning [average unit values],
> comparative financial data, industry capacity data, and
> questionnaire responses.  IIMAK may wish the ITC had
> weighed the evidence in a different manner, but that
> concern is not sufficient to sustain its appeal.

*Id*. at 37 (internal citations omitted).  This claim is supported

by the ITC Views and the evidence cited therein:  "The pricing

and average unit value data indicate that subject jumbo rolls

were priced higher than domestic jumbo rolls, and as such

[slitters] did not have a raw material cost advantage over

domestic coaters."  ITC Views at 35.


An examination of the data used by the ITC in reaching its

conclusion reveals that there were no indirect effects of the

sales of jumbo rolls because there was indeed no underselling of

imported jumbo rolls, nor was there any evidence that the

consumers of these rolls benefitted financially from their use.

Thus, despite IIMAK's arguments to the contrary, the ITC did

examine the possibility of indirect effects and supported its

conclusion that there were none with substantial evidence.

IV.  Reliability of Measurement of Price Effects

IIMAK next contends that the ITC erred by not using prices for finished TTR to measure the price effects of the subject merchandise imports.  In its analysis, the ITC used prices for imports of jumbo rolls.  As has been previously noted, there are few open market sales of jumbo rolls.  IIMAK argues:

> Price comparison data for products with low volumes are not reliable for purposes of making price comparisons. To the extent that data for low volume products show overselling, the ITC thus should not rely on this overselling to make a negative determination.  This Court has held that the ITC reasonably gives less weight to price comparisons for products where there are only a limited number of comparisons.[11]

Pl.'s Br. at 19–20 (internal citations omitted).

IIMAK's argument, in essence, is but another way of saying that it objects to the Commission's sole use of jumbo rolls when measuring volume.  The ITC disputes IIMAK's claim that the data it relied on for price comparisons was unreliable due to low

---

[11]  IIMAK cites several cases to support its position. *See, e.g., Taiwan Semiconductor Industry Ass'n v. United States*, 24 CIT 914, 925, 118 F. Supp. 2d 1250, 1260 n.15 (2000) ("The record supports the Commission's conclusion that the quantities of products . . . were relatively small.  Therefore, the Commission reasonably discounted the data regarding [these] products . . . in its analysis.") (internal citations omitted); *R-M Indus., Inc. v. United States*, 18 CIT 219, 228, 848 F. Supp. 204, 211 (1994) (affirming the ITC's decision to not rely on price comparison data where data was limited); *Trent Tube Div., Crucible Mat'ls Corp. v. United States*, 14 CIT 386, 403, 741 F. Supp. 921, 935 (1990) (giving limited weight to evidence of underselling where only a limited number of price comparisons were available).

product volume, explaining that it relied on these comparisons "because there were only small volumes of sales in this category," Def.'s Mem. at 34, not because the ITC failed to adequately investigate prices. In other words, "[s]ince there are not many sales of domestic jumbo TTR on the open market, the volume of shipments represented by the price data was of course small." *Id*. As this court has determined that the Commission is justified in its finding that slitters produce a domestic product, it will not disturb the ITC's use of jumbo rolls based on scarcity of transactions. Beyond showing that the ITC based its conclusions on a small number of transactions because there were, in fact, few transactions, IIMAK has failed to demonstrate that either the data or the conclusions drawn from the data are unreliable. *See* 19 U.S.C. § 1677(7)(c)(1) (affording the ITC broad discretion to determine the best methodology by which to measure volume). This being the case, the court sustains this portion of the ITC's findings.

V.   The ITC's Findings Related to Price Movement[12]

   Next, IIMAK contends that the ITC ignored pricing evidence

---

   [12]   Again, plaintiff's argument concerning the comparison of the subject imports to the domestic like product does not implicate its arguments concerning the inclusion of fax TTR in the definition of domestic like product.

calling into question its negative determination.[13]  The

Commission found that the movement of prices on the U.S. market

was unrelated to the prices of subject imports.  ITC Views at

34-35.  It reached this finding, at least in part, by examining

the prices at which "Product 3," which is the slit form of

wax/resin products manufactured by IIMAK and other producers, was

sold to original equipment manufacturers ("OEMs").  *See* Conf.

Staff Rep., Conf. R. Doc. 292 at Table V-6.[14]  IIMAK complains of

the ITC's finding of divergent trends, arguing that although U.S.

and import prices for sales of Product 3 to OEMs were divergent

over the period of investigation, the prices for sales of the

same product to slitters/converters and distributors/resellers

---

[13]     Title 19 U.S.C. § 1677(7)(C)(ii) provides that in
evaluating price effects, the Commission shall consider whether

> (I) there has been significant price underselling by
> the imported merchandise as compared with the price of
> domestic like products of the United States, and
> (II) the effect of imports of such merchandise
> otherwise depresses prices to a significant degree or
> prevents price increases, which otherwise would have
> occurred, to a significant degree.

*Id.*

[14]     Table V-6 shows that U.S. prices do not correlate to
the prices for the imported product.  For example, U.S. prices
increased from January through September of 2002, while import
prices decreased.  Similarly, U.S. prices fluctuated (i.e.,
decreased, then increased) from April through December of 2001,
while import prices steadily declined for one importer and
steadily increased for another.  Conf. Staff Rep., Conf. R. Doc.
292 at Table V-6.

were strongly correlated.[15]  While the ITC explains that it did not use the other products for which it had questionnaire responses because they included some domestic product, *see* ITC Views at 33, it does not provide an explanation in answer to plaintiff's argument.  Because the ITC does not address this argument in its papers, on remand, the Commission shall do so, stating with particularity whether plaintiff is correct with respect to its correlation calculations.

VI.  Volume — Market Share

In reaching its volume findings, the Commission concluded: "While the increase in absolute quantity of subject imports could be viewed as significant, subject imports grew only slightly relative to domestic consumption and decreased relative to domestic production.  Given that fact . . . we do not find subject import volume overall to be significant."  ITC Views at

---

[15]    IIMAK states:

While it is true that U.S. and import prices for sales of Product 3 to OEMs were divergent over the period of investigation, this product/channel combination is only one of four for which the ITC collected price data for sales of slit TTR, and accounted for only [[       ]] of U.S. coaters' shipment volume these four product/channel combinations and [[          ]] of importers'/converters' shipment volumes.  For the other three product/channel combinations, there were very strong correlations between U.S. and importer/converter prices for slit TTR.

Pl.'s Mem. at 21–22 (internal citations omitted).

32.

     With respect to market share, plaintiff makes two related
claims.  First, IIMAK claims that the Commission did not take
into account the increases in market share of imports during the
period of investigation, stating that "the ITC found an increase
in subject imports' market share over the period of
investigation.  It was inappropriate for the ITC to dismiss this
increasing market share of the subject imports without
explanation."  Pl.'s Br. at 22.  Thus, IIMAK maintains that the
ITC erred by failing to consider even small increases when, for a
fungible product such as TTR, "even small market share increases
can be injurious."  *Id*.  Thus, IIMAK insists that these absolute
increases in market share, even though small, must be considered.

     Second, IIMAK urges that 19 U.S.C. § 1677(7)(C)(i)[16]
requires the ITC to consider whether volume and market shares of
the subject imports are significant on an absolute basis, and
that "the ITC's volume findings are limited only to a
determination that the increases in the volume and market share

---

     [16]   The statute states in relevant part, "In evaluating the
volume of imports of merchandise, the Commission shall consider
whether the volume of imports of the merchandise, or any increase
in that volume, either in absolute terms or relative to
production or consumption in the United States, is significant."
19 U.S.C. § 1677(7)(C)(i).

are not significant. . . . As such, the ITC's analysis is incomplete in that it did not analyze whether the subject imports' market shares, standing alone, were significant." *Id*. at 23.

As to the second argument, the ITC defends its method of analyzing volume, explaining that "[u]nder the statute, the ITC considers whether the volume of subject imports *or* any increase in that volume, *either* in absolute terms *or* relative to production *or* consumption in the United States is significant." Def.'s Mem. at 32 (emphasis in original). The ITC cites several cases in which the Court has found that any one of the several methods of analyzing volume is sufficient. *See Copperweld Corp. v. United States*, 12 CIT 148, 167, 682 F. Supp. 552, 570 (1988) (explaining that the statutory language, "when read in conjunction with the legislative history[,][17] indicates that disjunctive language was chosen to signify congressional intent that the agency be given broad discretion to analyze import volume in the context of the industry concerned . . . ."); *see*

---

[17] The legislative history reads in relevant part: "In determining whether an industry is materially injured, as that phrase is used in the bill, the ITC will consider . . . the factors set forth in [the statute] *together with any other factors it deems relevant. . . .*" *Copperweld*, 12 CIT at 167, 682 F. Supp. at 570 (emphasis added)(quoting S. Rep. No. 249, 96th Cong., 1st Sess. 88, *reprinted in* 1979 U.S.C.C.A.N. 381, 474).

*also Am. Bearing Mfrs. Ass'n. v. United States*, 28 CIT __, __,

350 F. Supp. 2d 1100, 1108 (2004) ("Congress recognized that in

determining the significance of the volume, price effect, and

impact of imports in the U.S. market, the ITC must evaluate the

facts of each particular case, and the industry involved, and

make its material injury determination accordingly.").  Thus,

both the statute and the cases indicate that the Commission did

not exceed the discretion granted it in choosing to rely most

heavily on relative comparisons rather than the absolute size of

market share.


With respect to the small increase in subject import volume

and market share, the ITC observed:

> Subject import volume increased over the period
> examined, from 295 million msi in 2001 to 373 million
> msi in 2003, an increase of 26 percent; shipments of
> subject imports rose 18 percent over the same period.[18]
> . . .  As a percentage of domestic production, subject
> imports were [[      ]] percent (by quantity) in 2001,
> 19.7 percent in 2002, and 13.5 percent in 2003.  Thus,
> subject imports, measured as a share of domestic
> production, actually declined over the period of
> investigation.
>
> In contrast, the domestic industry's market share
> increased significantly over the period of

---

[18]    Specifically, "[s]ubject imports accounted for [[
]] percent of apparent U.S. consumption (by quantity) in 2001,
[[      ]] percent in 2002, and [[      ]] percent in 2003."  ITC
Views at 31.  Thus, subject imports' share of the U.S. market
increased less than [[                          ]] over the period of
investigation.

investigation.[19] . . . Coinciding with this increase
in domestic market share, nonsubject imports' market
share declined . . . over the same period.[20] Thus the
domestic industry gained market share at the expense of
nonsubject imports during the period of investigation.

ITC Views at 31—32 (citations omitted) (footnote omitted). Based on the foregoing, the court finds that the ITC conformed to the statute by examining the significance of volume relative to both production and consumption. While the Commission did not explicitly analyze the small absolute increase in imported product market shares, its discussion demonstrates that it was not unmindful of that fact. Therefore, the ITC has satisfied the statutory demands of 19 U.S.C. § 1677(7)(C)(i).

VII. Impact

A.   Profitability

IIMAK argues (1) that the ITC failed to address what it calls the "anomaly" of declining operating income and profitability at a time of increasing consumption[21] and (2) that

---

[19]     Specifically, "[t]he domestic industry's share of apparent U.S. consumption was [[      ]] percent in 2001, [[      ]] percent in 2002, and [[      ]] percent in 2003, for a period-wide increase of [[      ]] percentage points."  ITC Views at 32.

[20]     The market share for nonsubject imports declined by [[      ]] percentage points over the period of investigation. *See* ITC Views at 32.

[21]     IIMAK relies on Certain Ceramic Station Post Insulators from Japan, Inv. No. 731-TA-1023 (Prelim.), USITC Pub. No. 3578 (2003), to support its argument.  In that case, the ITC stated:
                                                      (continued...)

slight declines in operating income cited by the ITC "were skewed by one company with large and increasing profitability over the period of investigation."[22]  Pl.'s Br. at 24.  IIMAK claims that

_____

[21](...continued)

>    Based on significant declines or sustained weaknesses
>    in most of the performance indicators of the domestic
>    industry during a period of increasing demand and at
>    the same time that the subject merchandise was being
>    imported in significantly increasing quantities and
>    sold at prices significantly below the weighted average
>    of domestic industry sales, we find that the subject
>    imports had a significant adverse impact on the
>    domestic industry.

*Id*. at 14.

The ITC disputes plaintiff's characterization of its finding in Ceramic Station Post Insulators, stating that in that investigation, "the ITC found sustained weaknesses in most of the performance indicators of the domestic industry."  Def.'s Mem. at 38 (internal quotation omitted).  The ITC notes that this "sharply contrasts with the instant case, in which the ITC found not only that the industry was profitable, but also that the industry experienced significant gains in productivity and declining costs, accompanied by increases in production, shipments, and market share."  *Id*.

The court finds IIMAK's reliance on Post Insulators from Japan, Inv. No. 731-TA-1023 (Prelim.), USITC Pub. No. 3578 (2003), to be misplaced.  There, the ITC found a significant adverse impact on the domestic industry in part based on "significant declines or sustained weaknesses" in most of the performance indicators of the domestic industry.  *Id*. at 14. Here, by contrast, several large U.S. producers operated at a profit during the period of investigation.

[22]     IIMAK states:

>    Unlike all other coaters, [[          ]] increased its
>    operating income over the period of investigation; in
>    fact, it increased its operating income by [[     ]]
>                                         (continued...)

this company's increases in operating income over the period of investigation were not in line with the experience of the industry. *See id.* at 25. Thus, IIMAK insists that the ITC ignored a significant condition of competition when it did not account for this one company's data having overshadowed the data for the rest of industry. *See id.*

The ITC maintains that the anomaly to which IIMAK refers, i.e., that the domestic industry experienced declining operating income and profitability at a time of increasing consumption, was not in fact an anomaly, since the decline in operating income was slight and the decline in profitability was "marginal." Def.'s Mem. at 37.[23] The ITC also disputes IIMAK's contention that the data were skewed by one company with large and increasing profits

---

[22](...continued)
percent. It experienced these increases while [[        ]] experienced declines in operating income. Moreover, by the end of the period of investigation, [[        ]]'s operating income constituted [[        ]] percent of the operating income for the industry as a whole. Notably, [[        ]], a product for which there is not subject import competition.

Pl.'s Br. at 24–25.

[23]    Operating income declined by [[      ]] percent, while declines in operating income as a percentage of net sales (profit) decreased from [[      ]] percent in 2001 to [[      ]] percent in 2003, for a total decline of [[      ]] percent. ITC Views at 38; *see also* Conf. Staff Rep., Conf. R. Doc. 292 at Table C-3.

by noting that three other companies[24] also operated at a profit throughout the period of investigation.  *See id.*[25]

The court finds that the ITC has sufficiently addressed the "anomaly" cited by IIMAK.  First, there is little evidence that the conditions set out by plaintiff are abnormal, since the declines in both operating income and profitability were very slight.  *See supra* note 23.  Second, it is apparent that the facts do not support plaintiff's contention that only one company was profitable during the period of investigation.  Thus, the court finds no merit in IIMAK's contentions.

---

[24]   The other U.S. companies that performed profitably were [[                    ]].  Def.'s Mem. at 38; *see also* ITC Views at 38 (citing Conf. Staff Rep., Conf. R. Doc. 292 at Table C-3 for its finding that the domestic industry operated profitably during the period of investigation).

[25]   As previously noted, IIMAK also asserts that [[         ]] produced only [[          ]] TTR.  This assertion is unconvincing.  As the ITC notes:

This assertion ignores that [[

                                                  ]] . . . .  Just as the distinctions between [[
                                       ]] do not create clear dividing lines between slit fax TTR and slit barcode TTR, the fact that [[
                                     ]] does not mean its data should be set aside from the data for the rest of the industry.

Def.'s Mem. at 38, 39.

B.    The ITC's finding that "alternative factors," not imports, were the cause of price declines over the period of investigation.

The ITC found that several factors other than imports were responsible for declining prices during the period of investigation.  In particular, the Commission noted that intra-industry competition was severe, a finding that IIMAK does not dispute.  Nevertheless, IIMAK insists that the Commission erred in finding that factors other than imports were responsible for the price declines.

In particular, IIMAK claims that, in finding that Sony Chemical Corporation of America ("Sony") was the downward price leader, the ITC "has ignored data[26] pertaining to other producers

---

[26]     IIMAK contends that Table E-1, on which the ITC relies for its conclusions, actually shows "(1) pervasive underselling of [[                                          ]] and (2) early [[
                          ]]."  Pl.'s Br. at 26 (citing Conf. Staff Rep., Conf. R. Doc. 292).

A review of Table E-1 confirms that in most quarters from 2001 through 2003, the Japanese producers undersold [[
     ]] although not every Japanese producer undersold both [[
               ]] in every quarter.  Moreover, the Japanese producers undersold [[                                    ]] in only about [[    ]] of the twelve quarters from 2001 through 2003 for which data was provided.  The court finds that by showing that the history of declining prices did not show price reductions contemporaneous with imported merchandise underselling, the ITC has provided sufficient evidence to refute IIMAK's claim that domestic price declines resulted *solely* from competition from foreign imports.  Rather, the ITC has provided evidence to show
(continued...)

and disregarded the data in support of Sony's claim that it decreased prices to meet import competition." Pl.'s Br. at 25. In support of its claim, IIMAK cites Sony's Prehearing Submission in Support of the Petition, Conf. R. Doc. 253, in which Sony states that it "is not now, and has not been, the price leader in the industry. Rather, to the extent it has reduced prices at all, Sony has done so in order to meet the downward price competition led by global imports." *Id*.

The ITC insists that its conclusion that Sony was the downward price leader is supported by substantial evidence. It explains that it "relied on public statements . . . corroborating that Sony was at the front of an intra-industry price war, and on price data indicating that Sony . . . lowered its prices below those of [others] to gain larger volume sales." Def.'s Mem. at 37. As evidence for its conclusions, the Commission cites the statement of a Sony consultant who later became an executive, who stated that "through aggressive pricing, we believe we can cut our competition numbers from 19 or 20 down to five," and that "[w]e didn't start these price wars, but we're going to finish them." ITC Views at 30-31, 31 n.145. In addition, a large

---

[26](...continued)
that although domestic producers reduced their prices, they did so in large measure in response to severe intra-industry competition and because of increases in both capacity and productivity.

majority of the responding purchasers identified Sony as the price leader in the industry by 2003. *See* ITC Views at 36 n.176.

It is apparent that the ITC has provided substantial evidence showing that Sony was the downward price leader during the period of investigation.

IIMAK next argues that the ITC relied on erroneous data for its finding that price declines were caused by declines in unit costs and increases in productivity. IIMAK claims that the ITC's data, contained in Table D-1, Conf. Staff Rep., Conf. R. Doc. 292, pertained only to U.S. coaters' operations, even though the ITC included some slitters in the domestic industry. Thus, IIMAK argues,

> any evaluation of the costs for the domestic producers
> should include the costs of any slitters that are not
> excluded from the U.S. industry as related parties.
> Making the proper comparison reveals that unit prices
> declined by more than unit sales costs for the U.S.
> producers. Moreover, the correct data show that both
> gross and operating margins declined, an unlikely
> phenomenon when costs decline at the same rate as
> prices. Consequently, the ITC erroneously concluded
> that price declines were driven by declines in costs.

Pl.'s Br. at 27–28.

An examination of Table D-1 reveals that IIMAK is correct that it pertains only to U.S. coaters' operations, not to slitters. It would appear that the costs of domestic producers

should include both coaters and those slitters unrelated to foreign producers.  As this omission is unexplained by the Commission, on remand, the ITC is directed to provide an explanation as to why its analysis did not also account for the costs of U.S. non-related party slitters.

Finally, IIMAK contends that even if the factors cited by the ITC were, in fact, partly responsible for the domestic industry's price declines, the Commission did not address the question of whether the subject imports were *also* a cause of the domestic industry's injury.  IIMAK argues that a determination that imports are causing material injury under 19 U.S.C. § 1673d(b)(1) "does not require that the imports be the sole or principal cause of the injury," *Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381 (Fed. Cir. 2003); therefore, according to plaintiff, the ITC has failed to show that the subject imports are not at least a significant factor in causing the injury suffered by U.S. industry.  *Id*. at 29.

Despite IIMAK's claims, however, it is apparent that the ITC has applied the proper standard.  Indeed, the Commission made the very finding that IIMAK claims is absent. "We find that . . . imports . . . have not had a significant negative impact on the condition of the domestic industry during the period examined.

As discussed above, we find both the volume of subject imports

and price effects of the subject imports not to be significant."

ITC Views at 37.  Moreover, the ITC specifically addressed price

effects relating to imports, stating:

> The pricing data . . . reflect a downward trend for
> domestic prices during the period of investigation.
> This trend was the same at the jumbo roll stage of
> processing and at the finished [TTR] stage.  We find
> that the movement of domestic prices (upward and
> downward) was largely unrelated to the price of
> imported merchandise.

*Id*. at 34–35.[27]  Thus, plaintiff's assertion is not supported by

the record.


VIII.    The ITC's Determination That the Industry Is Not
         Threatened With Material Injury


Finally, IIMAK contends that the problems with the ITC's

material injury analysis "also infect the ITC's threat analysis,

thereby rendering the finding that the industry is not threatened

with injury fundamentally flawed as well."  Pl.'s Br. at 37.

IIMAK explains:

> The ITC found that "the increase in the volume and
> market share of the subject imports does not indicate a
> likelihood of substantially increased imports.  Subject
> imports increased only slightly relative to U.S.
> consumption and decreased relative to U.S. production."
> Properly measuring imports relative to consumption and

---

[27]    The ITC relies on Table V-6 of its Staff Report, which indicates that domestic price movements did not move in tandem with the prices of the imported merchandise.  *See* Conf. Staff Rep., Conf. R. Doc. 292 at Table V-6.

> production . . . would demonstrate dramatic increases in those export volumes. . . . [Moreover], [w]hen the ITC conducts a proper pricing analysis, it should find that subject imports had substantial negative price effects.

*Id*. at 37-38.  In addition, IIMAK disputes the ITC's reliance on the domestic industry's "positive and steady performance" for its finding that the U.S. industry was not threatened with injury. *Id*. at 38.  IIMAK claims that the ITC never addressed its claim that the industry was only able to maintain its profits "through cost-cutting measures that could not be sustained in the long-run." *Id*.

For its part, the ITC chooses to rest on its prior arguments regarding domestic like product, stating:

> [P]laintiff's claims concerning the ITC's finding of no threat of material injury stem from IIMAK's dissatisfaction with the ITC's definition of domestic like product and the domestic industry. . . .  For the same reasons that the court should reject plaintiff's efforts to reweigh the evidence and impose its own preferred methodology on the ITC's present injury analysis, the court should likewise reject plaintiff's claims regarding threat.

Def.'s Mem. at 39.

Here, a discussion of the questions of material injury and threat must await the Commission's response to the remand instructions.  As such, the court will address IIMAK's concerns following the ITC's response to those instructions.

CONCLUSION

Based on the foregoing, this matter is remanded to the ITC for action in accordance with this opinion.  Remand results are due on April 24, 2006, comments are due on May 24, 2006, and replies to such comments are due on June 5, 2006.


                                    /s/Richard K. Eaton
                                   Richard K. Eaton, Judge

Dated:    January 23, 2006
          New York, New York